Conway, Ch. J.
Plaintiffs have appealed directly to our court from a judgment of a • Special Term of the Supreme Court, Ulster County, entered upon an order dismissing the complaint in an action brought by them as taxpayers to restrain the defendant officers of the County of Albany from carrying out the provisions of chapter 305 of the Laws of 1954, as amended by chapter 864 of the Laws of 1955, which laws relate to the selecting, drawing, summoning or empaneling of jurors, on the ground that certain provisions of the New York State Constitution have been violated. Plaintiffs and defendants, in Special Term, had moved for judgment on the pleadings. The motion of defendants was granted dismissing the complaint, and the statute, as amended, was declared to be constitutional. The Attorney-General of the State of New York intervened as a party pursuant to stipulation and order. Plaintiffs (hereinafter *77 referred to as “ appellants ”) and the Attorney-Greneral (hereinafter referred to as “ respondent ”) have argued before our court and have submitted their respective briefs for our consideration.
The Legislature, by chapter 305 of the Laws of 1954, to take effect July 1, 1955, established a uniform jury system for all the counties of the State except counties within cities having a population of 1,000,000 or more. The five counties within the City of New York, which have a uniform jury system of their own (L. 1940, ch. 202), were thus excepted, and the 1954 act applied to the remaining 57 counties of the State. Chapter 864 of the Laws of 1955, however, to take effect on July 1, 1955 (the same effective date as the 1954 act), amended the 1954 act by providing that such jury laws should apply to all counties of the State except counties within cities having a population of 1,000,000 or more (the five counties in the City of New York) and except those counties having a population of less than 100,000 which elect to come under the provisions of a newly added article 16 of the Judiciary Law. In other words (except for the five counties in the City of New York) the jury laws of 1954, as a result of the 1955 amendment, thenceforth mandatorily apply only to those counties of the State with a population of 100,000 or more. According to the census figures of 1950, there are 15 such counties: Albany, Broome, Chautauqua, Dutchess, Erie, Monroe, Nassau, Niagara, Oneida, Onondaga, Orange, Rensselaer, Schenectady, Suffolk and Westchester. The 1954 jury laws still apply to the remaining 42 counties, i.e., those with a population of less than 100,000, except that, if any of them so desire, by appropriate county governmental action, it could elect not to be governed by such 1954 jury laws.
It is appellants’ contention that the 1954 statute, as amended in 1955, violates section 17 of article III, and subdivision (b) of section 1 of article IX of the New York State Constitution.
Section 17 of article III provides that: ‘ ‘ The legislature shall not pass a private or local bill in any of the following cases: * * * Selecting, drawing, summoning or empaneling grand or petit jurors. * * * The legislature shall pass general laws providing for the cases enumerated in this section * *
Subdivision (b) of section 1 of article IX provides that: “ The legislature shall provide by law for the organization and *78 government of counties. No law which shall be special or local in its terms or in its effect, or which shall relate specially to one county only, shall be enacted by the legislature unless (a) upon the request of the board of supervisors or other elective governing body of each county to be affected * * * or (b) upon a certificate of necessity by the governor to the legislature reciting the facts of such necessity existing in the county to be affected and the concurrence of two-thirds of the members elected to each house of the legislature.” (No request or certificate of necessity was made, it is conceded, and thus neither exception is applicable to this case.)
We shall first treat of article III (§ 17). The issue is simply whether the statute in the instant case is a local or general law.
At the outset, it should be noted that, in a case of this nature, “ we must keep in view the salutary rule, often reiterated, that nothing but a clear violation of the Constitution will justify a court in overruling the legislative will. Every statute is presumed to be constitutional, and every intendment is in favor of its validity.” (Matter of New York Elevated R. R. Co., 70 N. Y. 327, 342; see, also, Kittinger v. Buffalo Traction Co., 160 N. Y. 377, 393-394; McKinney's Cons. Laws of N. Y., Book 1, Statutes, § 150.)
It has many times been said that there is difficulty in laying down any definite or general rule by which the question of whether a law is local or general may be determined (Matter of Henneberger, 155 N. Y. 420, 425; Matter of Church, 92 N. Y. 1, 4; Matter of New York Elevated R. R. Co., 70 N. Y. 327, 350, supra; People ex rel. Clauson v. Newburgh & Shawangunk Plank Road Co., 86 N. Y. 1, 6), and “ it has been found expedient to leave the matter to a considerable extent open, to be determined upon the special circumstances of each case.” (Ferguson v. Ross, 126 N. Y. 459, 464.)
It cannot be doubted that a law which applies to all persons, places or things in the State is general. An act, however, which, by its terms, applies only to a named person, place or thing is clearly local. Between these two extremes there lies a field which has long been a source of anxiety to the courts. Early was it said that an act need not apply to all persons, places or things in the State to be deemed general, if it apply to a class, entry into which was governed by conformity or compliance with specified conditions. Thus was born the theory of “ classifi *79 cation.” A typical condition common to the class, where a place happened to have been concerned, was that the place have a given population. (See Matter of Henneberger, 155 N. Y. 420, 426, 430, supra.)
An early line of cases (Matter of Church, 92 N. Y. 1, supra; People ex rel. New York Elec. Lines Co. v. Squire, 107 N. Y. 593, affd. 145 U. S. 175) involved statutes which were held constitutional as general laws on the sole ground that the acts, by their terms, applied to all members of a class. The court failed to take cognizance of the true effect of the purported classification. Subsequently, however, the court, in Matter of Henneberger (155 N. Y. 420, supra) refused to be deluded by this aura of generality and struck down an act which created a class, entry into which, however, was governed by compliance with at least seven conditions. Our court said, at page 425: “ That the present act is expressed in general terms is not, and should not be, decisive of the question of its constitutionality.” And, in considering the words of generality in which the act was clothed, the court declared, at page 426: ‘ ‘ Although this act is drawn in general terms, if its provisions are such in number and in character as unduly * * * to restrict its operation and, to all intents, to confine it to a particular locality, then, I think, it comes as much under condemnation, as though it designated the locality by name.”
In speaking of Matter of Henneberger (supra) Chief Judge Cakdozo, in Matter of Mayor of City of New York (246 N. Y. 72, 76), stated: “ There was here [in the Eenneberger case] * * * the germ of a doctrine more adapted to realities.” In Matter of Mayor of City of New York (supra) the court was confronted with a statute which purported to revive entitlement to condemnation awards which had been barred by a Statute of Limitations. The act, in substance, provided that where an award in condemnation proceedings relating to the alteration or opening of a street in any city had been confirmed by the court, but had not been paid, and was adjudged by a court to have been barred sometime within the previous year, then the collection of the award could be enforced within one year. In strildng down this statute as a local law in violation of the City Home Rule provision (now art. IX, § 11) of the Constitution, our court declared, at pages 77-78: “ We close our eyes to realities if we do not see in this act the marks of legislation *80 that is special and local in terms and in effect. This group of conditions so unusual and particular is precisely fitted to the claimant’s case, and only by a most singular coincidence could be fitted to any other.” In concluding (p. 79), Chief Judge Cabdozo described the act as one where ‘ ‘ A misshapen congeries of accidents has been made to masquerade under the semblance of a class.” (See, also, Greene v. Dunscomb, 281 N. Y. 261.)
The stage was thus set for Stapleton v. Pinckney (293 N. Y. 330), decided in 1944, in which our court considered the validity of a statute under section 17 of article III of the State Constitution, which statute, similar to the one in the instant case, related to the selection of jurors. The act was applicable to counties with a population of not less than 200,000 and not more than 250,000 and containing a city with a population of at least 125,000. The court pointed out that the County of Albany alone fitted into the pattern. In declaring the statute unconstitutional as a local law, our court said, at pages 335-336: u We find it difficult, however, to discern in the circumstance that Albany County has a population of over 200,000 and less than 250,000 and contains a city with a population of over 125,000, any reasonable ground for the creation of a separate class * * * applicable only to Albany County. * * * We assume * * * that reason for the procedure formulated in the statute may be found in local conditions existing in Albany, but it cannot be argued that such local conditions are in any way related to the circumstance that Albany County has a population of more than 200,000 and less than 250,000 and contains a city with a population of 125,000. * * * The Act is local if the references to population in the Act serve only to identify the county of Albany * *
A reading of the Henneberger, Mayor and Stapleton decisions (supra) discloses that the act under consideration here—both in its terms and in its effect—bears no resemblance to the statutes involved in those eases. However, those decisions are helpful to the extent that they do lay down certain general principles which we may use as a guide in this case. Briefly, the pertinent principles to be learned from them are as follows: In order to be deemed general, unless the act applies to all places in the State (e.g., all the counties), it must create a class. The class constructed by the act may be based on population, and will be upheld, if conditions, because of such population, can be *81 recognized as possibly common to a class and are reasonably related to the subject of the statute. Separate classes based on population are permissible where conditions due to differences in population might reasonably require differentiation in laws applicable to them. However, where the reference to population serves only to designate and identify the place to be affected, it will be deemed a local act. In the latter situation, the purported class would be one in name only — a local law masquerading as general.
Bearing in mind the foregoing principles, we shall now treat of the statute under consideration. It has been urged that the breaking figure of 100,000 was arbitrary. With this we hasten to disagree. Let us, populationwise, consider the various counties of the State, as of 1950, and according to the census figures of that year. The State of New York has a population of 14,830,192. The City of New York, containing the Counties of Kings, Queens, New York, Bronx and Richmond, has a population of 7,891,957. It is thus evident that the City of New York has a greater population than the rest of the State. The 57 counties outside the City of New York, together, have a population of 6,938,235. The 15 of such counties, with a population of 100,000 or more, together, have a population which is greater than that of the remaining 42 counties combined. The 15 counties (over 100,000) have a total population of 4,839,559. The 42 counties (under 100,000) have a total population of 2,098,676. The average population of the 15 counties (over 100,000) is 322,637. The average population of the 42 counties (under 100,000) is 49,968. Of the 15 counties (over 100,000) Erie County has the greatest number with 899,238, while the least populated is the County of Rensselaer with 132,607. However, 10 of the 15 counties (over 100,000), i.e., 66%% of them, have á population ranging from Broome County’s 184,698 to Erie County’s 899,238. Of the 42 counties (under 100,000) St. Lawrence County has the greatest number with 98,897, while the least populated is the County of Hamilton with 4,105. However, 30 of the 42 counties (under 100,000), i.e., 71 3/7% of them, have a population ranging from Montgomery County’s 59,594 to Hamilton County’s 4,105. The foregoing figures speak for themselves. We may fairly say that the breaking figure of 100,000 was not arbitrary. It was a mode of separating the small counties from the middle-sized counties, *82 and the chosen figure was reasonably suited to achieve that end. We are not passing upon the advisability of the change.
Appellants contend that the aim of the 1954 Legislature was uniformity of jury laws throughout all the up-State counties, and that, by virtue of the 1955 amendment, this uniformity was destroyed. This cannot conceivably be of help to the appellants. Admittedly, the 1954 Legislature sought to effectuate uniformity. It does not follow, however, that a subsequent Legislature is precluded from modifying that policy except at the risk of having its acts characterized as arbitrary. With the Legislature resides the power and discretion to shape policy. This is so, even if, as claimed, one Legislature violently disagrees with its predecessor. If the 1955 Legislature erred, it is for subsequent Legislatures to cure the error and not for the judiciary to undertake to do it. As is succinctly stated in McKinney’s Consolidated Laws of New York (Book 1, Statutes, § 2): “ The power to enact necessarily implies the power to repeal, and one Legislature cannot be limited or bound by the actions of a previous one. Hence every Legislature may modify or abolish its predecessor’s acts, unless restricted by the Constitution, and the wisdom of doing so is a matter of legislative discretion.” (See cases therein cited.)
It is claimed that the 1954 act effected a momentous and fundamental change in public policy with respect to the jury systems of all up-State counties, and that the 1955 amendment, by the creation of separate classes, modified such policy. Suffice it to say, in this respect, that “ Public policy is necessarily variable. It changes with changing conditions. It is evidenced by the expression of the will of the Legislature contained in statutory enactments. * * * The power to determine what the policy of the law shall be rests with the Legislature within constitutional limitations, and when it has expressed its will and established a new policy, courts, are -required to give effect to such policy.” (Straus & Co. v. Canadian Pacific Ry. Co., 254 N. Y. 407, 413-414). Thus, just as the Legislature of 1954 had the power to, and did, as it is claimed, effect a change in public policy, the Legislature of 1955 likewise had the power to, and did, modify the apparent change in policy made by its predecessor.
It is urged that there is no official record concerning the factual background and history of the 1955 act, and that there is *83 no committee report which, discloses any reason why the 42 counties (under 100,000) were relieved from mandatory compliance with the provisions of the 1954 law. It is true that the existence of records and reports is of great help to the courts in ascertaining the motive and intent of a Legislature. There was abundant documentation leading up to, and surrounding the passage of, the 1954 law. (See Twentieth Annual Report of N. Y. Judicial Council, 1954, pp. 60, 157 et seq., respectively; Twenty-First Annual Report of N. Y. Judicial Council, 1955, p. 149 et seq.; Third Report, New York State Crime Commission, May 4,1953.) The Judicial Council recommended to the Legislature that which subsequently became the 1954 jury law, and, it is quite clear that, in adopting such recommendation, the 1954 Legislature intended uniformity as to jury laws to prevail in all the up-State counties. Should the 1955 Legislature, however, be characterized as having acted arbitrarily — solely because of the unavailability of records and reports whereby light could be shed on its motive and intent? Clearly not. The passage of the 1955 amendment speaks for itself. The intent of the Legislature was to accord separate treatment to counties having a population of less than 100,000 if they wished it. That much is apparent from a reading of the statute itself.
What we have said up to this point presupposes the fact that the 1955 Legislature had the power, in the face of section 17 of article III of the Constitution, to create the classification whereby counties with a population of less than 100,000 were given the option to be or not to be governed by the provisions of the 1954 law. We shall now consider whether or not such power existed.
Distinction by classification, populationwise, is grounded in good sense. It has been said that “ the complexity of community regulation increases directly in proportion to increases in population, and that statutes necessary for a large community would be too burdensome for a smaller community.*’ (2 Sutherland on Statutory Construction [3d ed., 1943], § 2109, p. 39.) In Matter of Henneberger (155 N. Y. 420, 429-430, supra), we said, as reiterated in People v. Dunn (157 N. Y. 528, 541), that “ good reasons exist why, in a general law, reference may be had to conditions of population, whether in counties, cities, towns or villages, or with respect to a proximity to cities of a certain growth.” Judge Werner, speaking for our court in *84 Matter of Ahern v. Elder (195 N. Y. 493), was confronted with a question as to the validity of a voting statute under the same constitutional provision with which we are concerned here (now art. Ill, § 17). That act, which was applicable only to cities of 1,000,000 or more, was upheld as a general law. We said, at page 499: “ Such a regulation as would be proper and sufficient in the villages and towns of the state would prove inadequate and futile in the larger cities and the same argument applies to a classification of the various cities upon the basis of population.” And further, at page 500, we declared: “ If a registration law, to be constitutional, must be absolutely uniform in its application to every part of the state, it needs no argument to prove that it will be utterly ineffective in the large cities, if framed according to the needs of rural communities, and grossly oppressive in many parts of the state, if modeled upon the requirements of densely populated centers.” And still further, at page 501, in adopting a quotation from Patterson v. Barlow (60 Pa. St. 54, 55), we said: “ ‘ Of necessity, laws passed to promote a given object, must be controlled or modified by the circumstances surrounding the object, and must be framed to meet the exigencies standing in the way of the end to be reached. If uniformity of regulation be unsuited to different localities, the end must be attained by diversity.’ ” (Entire quotation was italicized in official report.) In Adler v. Deegan (251 N. Y. 467) we were faced with a statute which applied to all cities having a population of 800,000 or more. The City of New York happened to be the only city that fitted the description. Although the constitutionality of such act was sustained on other grounds, it was said by Judge Pound, in his concurring opinion, at page 483: “ To exact that laws peculiarly adapted to conditions existing in the city of New York must apply alike in terms and effect to all cities, is to deny to the Legislature all powers of reasonable classification based on population in matters within its field of operation. * * * [The statute] is based on a reasonable classification, which properly separates the city of New York with its population of 6,000,000 and upwards from all other cities of the State; from Buffalo with its estimated population of 500,000 and upwards, as well as from the little cities of 10,000 population or less; and that, tested by the legislative interpretation of its purpose and by the decisions of this court, it cannot be condemned as a mere subterfuge, scheme or device *85 to evade wholesome constitutional provisions.” In Robinson v. County of Broome (276 App. Div. 69, 73, affd. 301 N. Y. 524), which involved a statute which applied to each town in the State with a population of 50,000 or more, the Appellate Division declared that: “It goes without saying that welfare problems and their administration differ in communities of various sizes. It cannot be said that a classification based on population is unreasonable or arbitrary.”
The classification system created by the 1955 amendment was adequate. The amendment did not remove any counties from the classes created by the 1954 act. It merely permitted any county, with a population of less than 100,000, to leave its class and subject itself to a newly created article of the Judiciary Law only if and when, by appropriate county governmental action (pursuant to Judiciary Law, § 501), it evidenced its desire to do so. Thus an affirmative act indicative of its desire to leave its class was necessary before a county could remove itself from one of the classes set up by the 1954 jury law. This was an additional check to the customary classification system where a line is drawn, and, according to its population, a given county will find itself either on one side or the other. In such a situation, a change in the line of demarcation would be impossible except by act of the State Legislature, unless and until, of course, a given county achieved the requisite population.
The 1955 amendment in effect created three separate classes. It caused the requirements of the 1954 law to mandatorily apply to the 15 counties with a population of 100,000 or more; it caused them to optionally apply to the 42 counties with a population of less than 100,000; and, similar to the 1954 act itself, it excepted and excluded the five counties in the City of New York from its operation. It and similar classification systems, are not novel, unusual or revolutionary in our law — fundamental or statutory. A perusal of the Constitution and statutes of our State discloses a host of provisions which differentiate, or have differentiated, among and between the densely populated City of New York with its five large counties, the middle-size counties and cities, the small counties and cities, and some, in addition, provide for the very small counties and cities. (Relating to county and city classification, based on population, see e.g.: N. Y. Const. [1894], art. XII, § 2; art. XII, § 2, as amd. in 1907; N. Y. Const. [1938], art. VIII, § 10; N. Y. Const., art. VI, § 13; N. Y. Const. *86 [1938], art. VM, §§ 6,7; N. Y. Const. [1938], art. II, § 5; former Optional County Government Law, §§ 1003,1200,1202, 309,1114, 1208; Election Law, § 30; Executive Law, §§ 131,139; Insurance Law, § 122; General Municipal Law, § 209-m; County Law, § 828; Alcoholic Beverage Control Law, § 38; Tax Law, §§ 229, 249-u, 249-dd, and 291, 292-b, deleted in 1949 [L. 1949, ch. 551] and 1955 [L. 1955, ch. 651], respectively; L. 1929, ch. 310, § 1; L. 1952, ch. 148, § 1, as amd.; Alcoholic Beverage Control Law, § 83; Banking Law, §§ 90, 95, 160, 240, 290; Domestic Relations Law, §§ 11, 13-a; Education Law, §§ 272, 408, 2501, 2550, 3204, 3609; Election Law, §§ 159, 187; General Business Law, §§ 40, 191; General Municipal Law, §§ 9, 234; Insurance Law, § 119; Public Health Law, §§ 312, 360-377, 2130, 2131; Public Lands Law, § 53; Public Officers Law, § 16; Tax Law, §§ 4, 98; Vehicle and Traffic Law, § 2; Workmen’s Compensation Law, § 3; L. 1947, ch. 278, §§ 3-a, 3-b, as added by L. 1951, ch. 811; L. 1911, ch. 833.) Even with respect to towns and villages there has been classification based on population. (See, e.g., N. Y. Const. [1938], art. II, § 5; N. Y. Const. [1938], art. IX, § 16; N. Y. Const. [1938], art. XVIII, § 4; Town Law, §§ 10, 12; Village Home Rule Law, § 2.) It would seem on the basis of the foregoing constitutional and statutory provisions that, in our State, a tripartite system of classification based on population is common practice, and, it seems to us, entirely justified. These constitutional and statutory provisions are merely cited as illustrative of a classification pattern; in doing so, however, we are not indicating that the statutes listed ¿ccord with the demands of section 17 of article HI, or subdivision (b) of section 1 of article IX of the Constitution.
It might be well at this time to trace the background of the 1954 jury law here under consideration. The Judicial Council of the State of New York recommended to the Legislature that which ultimately became, when adopted by the Legislature (L. 1940, ch. 202), a system of uniform jury laws applicable to the City of New York. Thereafter, in 1941 and 1942, the Judicial Council recommended uniform jury laws for all counties (outside of the City of New York) with a population of 48,000 or more. In this respect, the Judicial Council wrote: “ By Chapter 202 of the Laws of 1940, a complete revision of the jury system within the city of New York was enacted. * * * The Council now, in the following proposed new Article 18 of the Judiciary *87 Law, recommends a similar revision of the jury system for the larger counties of the State outside of the City of New York. * * * The proposed revision establishes a fairly completely centralized jury system under the direction of a .commissioner of jurors in each county of the State outside of the city of New York having a population of forty-eight thousand or more [listing the affected 31 counties by name] * * * in addition, any other county having a population of less than forty-eight thousand [26 counties] may make applicable to itself the provisions of the proposed law by resolution of the County Board of Supervisors.” (Seventh Annual Report of N. Y. Judicial Council, 1941, p. 153; Eighth Annual Report of N. Y. Judicial Council, 1942, p. 193.) Subsequently, the Judicial Council said: “ * . * * bills relating thereto [to the recommendation for a jury system for counties having a population of 48,000 or more] were introduced in the Legislature in 1941 and 1942, but were not reported out of the Judiciary Committees in those and subsequent years. From 1942 to 1946 the Judicial Council renewed its recommendation. In 1946, the Council tabled the matter. However, it directed the attention of the Legislature to its Supporting Study should amendments to the laws relating to jurors be considered. * * * The substance of the unified jury system proposed by the Judicial Council was endorsed by the New York State Crime Commission, as follows: [Third Report, New York State Crime Commission, May 4,1953] 1 The public interest demands a simple, efficient and uniform jury system. The Commission * * * recommends legislation to put into effect the plan proposed by the Judicial Council. The Commission does not, however, limit its recommendation to counties having a population of 48,000 or more, as did the Judicial Council.’ At a meeting of the Judicial Council in 1953 the matter was reconsidered * * *. The present recommendation [to the 1954 Legislature] would establish a centralized jury system under the direction of a commissioner of jurors in each county of the State outside the city of New York.” (Twentieth Annual Report of N. Y. Judicial Council, 1954, pp. 60-62.) Thus, on the basis of the latter recommendation, did the Legislature enact chapter 305 of the Laws of 1954, to be effective July 1, 1955. As to the reason for deferring the effective date, the Judicial Council wrote: “ This was done in order that ample opportunity should be afforded all persons *88 interested to suggest further amendments to the Judicial Council for recommendation to the Legislature of 1955 * * (Twenty-First Annual Report of N. Y. Judicial Council, 1955, p. 149.) It does not appear that a suggestion to confer an optional privilege upon counties having a population of less than 100,000 was ever forwarded to the Judicial Council. Nevertheless, we cannot say that the members of the Legislature were not afforded seasonable notice and knowledge of such a proposal. In fact, in the 1955 New York State Legislative Annual, appeared a memorandum by Assemblywoman Mildred F. Taylor, of Wayne County (population of 57,323), wherein it was said, at page 53: “ This bill [which ultimately became the 1955 amendment] is introduced at the request of many rural counties * * She then, at page 54, pointed out that, in her opinion, the objectionable nature of the 1954 act lay in, among other things, its: “ Mandating increase[d] (sic) costs (estimated in my county Wayne, ten to fifteen thousand to establish Commissioner of Juror Division).” Although the above-quoted matter might serve to indicate that the Legislature of 1955 acted with the requisite knowledge, we need not go so far. We said, in People v. Griswold (213 N. Y. 92, 96-97) that: “ In determining whether statutory requirements are arbitrary, unreasonable or discriminatory, it must be borne in mind that the choice of measures is for the legislature, who are presumed to have investigated the subject, and to have acted with reason, not from caprice.” In Atchison, Topeha & Santa Fe R. R. Co. v. Matthews (174 U. S. 96, 104), it was said: “ It is # * * a maxim of constitutional law that a legislature is presumed to have acted within constitutional limits, upon full knowledge of the facts, and with the purpose of promoting the interests of the people as a whole * * Thus, “If it is essential that the legislature have evidence of particular facts in order properly to pass a statute, it is presumed that such evidence is actually and properly before the legislative body and that it acted on a full knowledge of the facts.” (11 Am. Jur., Constitutional Law, § 131, pp. 794-795, and see cases therein collected.)
The record before us discloses an allegation of appellants’ complaint to the effect that compliance by the officers of Albany County (population of 239,386) with the requirements of the 1954 jury law would be a burden upon the taxpayers of said county because of the necessity of the hiring of and payment *89 of additional clerical assistance, the purchase of stationery, the preparation of jury lists, the printing of forms and the mailing of thousands of notices. In order to comply with those requirements, the record discloses that the Board of Supervisors of Albany County adopted a resolution on June 16, 1955, whereby its County Treasurer was authorized to allot the sum of $15,000 on the budget. It would seem from the foregoing that compliance with the requirements of the 1954 jury law would involve considerable added expense. And, we may fairly conclude, all counties, as well as the County of Albany, would be required to face additional costs. ' If, as alleged, the requirements of the act result in a burden to Albany County, how much more severely burdensome would they be upon small counties.
But, we are told, the 1954 jury law rendered special consideration to small counties, when, in recommending what subsequently became the 1954 act, the Judicial Council stated: “Recommended new section 653 permits the appointment of the county clerk as the commissioner of jurors within the discretion of the county jury board. However, this is intended to meet the situation in counties which are very small or not financially able to provide for a full time commissioner.” (Twentieth Annual Report of N. T. Judicial Council, 1954, p. 162; emphasis added.) The answer to this is simply that the 1955 Legislature, in creating a separate class for the small counties, apparently felt that that provision alone was not adequate to take care, for each and every of the small counties, as to its population or financial difficulties as envisioned by the Judicial Council.
We shall now treat of whether the class created by the 1955 amendment was arbitrary, or whether it was based on conditions which could be recognized as possibly common to the class and reasonably related to the subject of the statute. It should be emphasized that we need not be absolutely certain as to the motive and intent of the 1955 Legislature. We need only find some reasonable and possible basis for the classification created. Viewed in that light, we cannot say that the classification system created by the 1955 Legislature was arbitrary. It cannot be doubted that small counties (under 100,000) have a more limited financial capacity, potential and economic make-up than the middle-sized counties (over 100,000). Because of that disparity, it follows that similar laws would affect them differently. We may fairly conclude that compliance with the requirements of *90 the 1954 act would involve additional expense. Obviously, therefore, the effect of compliance would be more severely burdensome on the small counties. It must be remembered, as mentioned earlier, that 71 3/7% of the 42 counties with a population of less than 100,000 range from Montgomery County’s 59,594 to Hamilton County’s 4,105; and that 66%% of the 15 counties with a population of 100,000 or more range from Broome County’s 184,698 to Erie County’s 899,238. Thus, since the contrast is great, the effect of similar laws on the respective classes of counties would be proportionately different. The provision of the 1954 jury law, whereby a county clerk could be appointed commissioner of jurors, was apparently intended for the benefit of small counties. The 1955 Legislature, however, could, with reason, have felt that that provision alone was insufficient to cure the disparity between the small and middle-sized counties. It should be reiterated that the Judicial Council, in 1941 and 1942, recommended to the Legislature jury laws which would be applicable only to counties with a population of 48,000 or more. Any county with a population of less than 48,000 was to be given an option to be governed by such jury laws if, by appropriate county governmental action, it exercised its election to be so governed. The Judicial Council did not modify its recommendation until 1953 at which time it was advised of a report by the New York State Crime Commission to the effect that the proposed jury laws should apply to all up-State counties and not only to those with a population of 48,000 or more. Adopting the recommendation as so modified the Legislature passed a jury law in 1954, to take effect July 1, 1955. The 1955 Legislature amended such jury law by permitting any county with a population of less than 100,000 to elect to be governed by a newly added article of the Judiciary Law. It is to be noted that the classification system created by the 1955 amendment is not substantially at variance with the earlier recommendation of the Judicial Council. Both classifications granted small counties an optional privilege. The breaking figure of 48,000 was suggested by the Judicial Council, while 100,000 was used by the 1955 Legislature. Those figures, in effect, are not so different as they would appear to be, because, as mentioned earlier, 71 3/7% of the 42 counties with a population of less than 100,000 have 59,594 and less, The optional privilege varies in the sense that, by the *91 1941 and 1942 recommendations of the Judicial Council, insofar as a county with a population of less than 48,000 was concerned, such a county could enter the class of the larger counties, by appropriate county governmental action, whereas, by virtue of the 1955 amendment, a county with a population of less than 100,000 could leave the class of the larger counties, by such appropriate county governmental action. Thus, in conformity with the earlier recommendation of the Judicial Council, the 1955 Legislature apparently felt that the smaller counties should determine for themselves whether, because of their respective needs, desires and financial capacities, they should subject themselves to the requirements of the 1954 law. The Legislature could, with reason, have felt that mandatory compliance by the small counties would be unduly burdensome, and thus do more harm than good. Furthermore, the fact that the Judicial Council, in originally recommending the jury laws to the Legislature in 1941 and 1942, proposed that counties of “ less than 48,000 ” population (26 counties) should be accorded optional compliance with the law, and the fact that, even after it modified its recommendation in 1953 (by suggesting that such jury laws should be applicable to all up-State counties), it again recognized the plight of small counties by making provision in the recommended act especially for the “ counties which are very small or not financially able ” by permitting the appointment of a county clerk as commissioner of jurors, shed further light on the conclusion that the 1955 Legislature acted with reason, and not arbitrarily. The inference, we believe, is irresistible that a class was recognized as actually existing within a class. The 1955 amendment merely took the “ small-county ” class out of the mandatory coverage of the 1954 jury law under certain conditions.
In view of what has been said, we may reasonably discern the fact that the 1955 Legislature, acting with sufficient knowledge of the requisite facts and acting with reason rather than from caprice, in creating a separate class for counties having a population of less than 100,000 believed that those counties, because of their small population, had such a limited financial capacity, potential and economic make-up, that mandatory compliance with the requirements of the 1954 law would be unduly burdensome. Thus we conclude that the class created by the *92 1955 amendment was based on conditions Avhich could be recognized as possibly common to the class and reasonably related to the subject of the statute.
It is also urged that, in reliance on certain language found in Stapleton v. Pinckney (293 N. Y. 330, 336, supra), the 1955 amendment did not really create a “ class ” but was merely a device in terms applicable to a class of counties defined solely by reference to population, though the conditions intended to be remedied had no apparent relation to the basis of the classification. Equating and particularizing this language to the instant case, appellants avouM seem to contend that the exemption of the 42 counties (under 100,000) had no apparent relation to remedying the conditions intended to be remedied by a uniform jury system.
At the outset, it cannot be said that the statute which confronted the court in the Stapleton case (supra) bears any resemblance whatever to the statute under consideration here. In that case, the jury law applied to counties having a population of not less than 200,000 and not more than 250,000 and containing a city with a population of 125,000 or more. This act, was, of course, general in its terms in that it was applicable to all counties which fitted into the population pattern. However, at that time, 1944, the act could apply only to the County of Albany. As of 1950, according to the census figures for that year, it could still have applied only to the County of Albany. (The population of Albany County, as of 1950, was 239,386, and contained a city [Albany] whose population was 134,995.) A ‘1 class ’ ’, to be workable, must, of necessity, serve the purpose of identifying the localities which are to be affected by the act. This is done by reference to certain population factors, within A\rhich or outside Avhich a given locality will fall. The statute creating a class in such manner will be condemned, however, if the references to population are used solely to identify the locality which is to be affected. That was the vice of the statute in the Stapleton case. It was so hedged and restricted with population factors that it could apply only to the County of Albany, and, as we said thereWe find it difficult * * * to discern in the circumstance that Albany County has a population of over 200,000 and less than 250,000 and contains a city with a population of over 125,000, any reasonable ground for *93 the creation of a separate class * * (Stapleton v. Pinckney, supra, pp. 335-336.) That was clearly correct. Similarly, in Matter of Henneberger (155 N. Y. 420, supra) we lifted the veil of generality with which the act was clothed and found a statute which was not general in its effect. The statute in fact created a class in name only — a local law masquerading as general. The statute in the instant case, however, is clearly different. Here, the classification was not restricted and encumbered with population conditions such as in the Stapleton case. Inclusion in the class to which the optional privilege accrued depended only on whether a county had a population of less than 100,000. It was not patterned along the lines of the population characteristics of a particular county, but, in fact, was applicable to as many as 42 counties. Of necessity, as mentioned earlier, the reference to population in the act must serve the purpose of identifying the localities to be affected. That it did by the imposition of the £< less than 100,000 ” condition. However, unlike the statute in the Stapleton case, the statute here under consideration did not refer to the population factor solely to identify the counties which were to be affected by it. It served the additional purpose of segregating the smaller counties in order to accord them separate and more appropriate treatment. Here, we are able to discern, in the circumstance that counties have a population of less than 100,000, a reasonable ground for the creation of a separate class. This is so for the reasons hereinbefore mentioned. We thus do not have here a class in name only.
With respect to the assertion that the classification of the 42 counties (under 100,000) had no apparent relation to remedying the conditions intended to be remedied by a uniform jury system, it must be said that the difficulty with such statement is that the Legislature of 1955 (as distinguished from the one of 1954) was not concerned with unifying the jury laws in all 57 up-State counties. Its aim, as appears from the face of the act itself, was to accord separate treatment to the small counties, i.e., the 1955 Legislature created a new article of the Judiciary Law especially for those small counties which, because of their respective needs, desires and financial capacities, as evidenced by appropriate county governmental action, elected not to be governed by the provisions of the 1954 act. The classification of the 42 counties *94 (under 100,000), therefore, did have an apparent relation to remedying the conditions intended to be remedied by the 1955 Legislature.
We feel that the following quoted matter from Stapleton v. Pinckney (293 N. Y. 330, 335, supra) left the door open for a statute with a classification system such as that in the present case: “ In many cases since Matter of Henneberger (supra) beginning with People v. Dunn (157 N. Y. 528) this court has sustained classifications based on population though such statutes could at the time apply only to counties within the city of New York or to Brie County or to Monroe County. The court has recognized that classification may be reasonable which separates New York City, with its population of 6,000,000 and upwards, from all other cities of the State, or which places Brie County, containing the city of Buffalo, or Monroe County, containing the city of Rochester, in separate classes based on population. In all those cases it could be said that conditions due to difference in population might reasonably require differentiation in laws applicable there. ’ ’ It should be noted that the court below in the instant case was correct, when, in its opinion, it stated in part: ‘ ‘ Differentiation in the treatment of municipal corporations according to their population is consonant with our history and traditions. There are many reasons for so doing, and their differing financial capacities furnish but one of them. The Legislature has not stated the reasons which motivated it to exclude the smaller counties from the mandatory operation of the uniform jury law. Whatever its personal preference, this court may not say that such reasons do not exist. The wisdom of the statute is not a subject of judicial concern.”
The 1954 jury law, as amended by the 1955 act was, of course, general in its terms in that it was applicable to 42 counties which fitted into a population pattern. Because it created a true class, based on population, for the various reasons hereinbefore stated, it was also, in the sense of the Constitution, general in its effect. It is thus not subject to the condemnation of section 17 of article III of the State Constitution.
We shall now treat of the validity of the statute under subdivision (b) of section 1 of article IX of the Constitution. Under that provision, the Legislature may not enact a law, which is local in its terms or in its effect, where the subject of such law *95 relates to the “ organization and government of counties.” Where an act does not relate to the organization and government of counties, the Legislature is not restricted. In Stapleton v. Pinckney (293 N. Y. 330, supra), where the court passed on the validity of a “ selection of jury ” law under section 17 of article III and subdivision (b) of section 1 of article IX of the Constitution, the court condemned the act as local under section 17 of article III, and thus was not required to nor did it reach the question of whether a “ selection of jury ” law is a law relating to the organization and government of counties under subdivision (b) of section 1 of article IX. Even though we find the act here to be general, we likewise are not required to meet that question. In fact, it would seem that, as to a “ selection of jury” law, the question whether or not such a law relates to the “ organization and government of counties ” under subdivision (b) of section 1 of article IX need never be reached. This is so, because a “ selection of jury ” law is one of the enumerated restrictions on the Legislature under section 17 of article III; and, if an act is branded as local under that provision, such act is unconstitutional,- and subdivision (b) of section 1 of article IX obviously need not be considered (this occurred in the Stapleton case, supra). If the law is deemed general and thus not within the prohibition of section 17 of article III, even assuming that it is a law which relates to the organization and government of counties, since it is a general law it cannot be condemned as violative of subdivision (b) of section 1 of article IX. The latter alternative applies to the present case. We have decided that the statute under consideration in this case is not local in its terms or in its effect. Consequently, assuming, without deciding, that the statute is a law relating to the organization and government of counties, it is not violative of subdivision (b) of section 1 of article IX.
The judgment should be affirmed.