Chief Judge Breitel
(dissenting). I dissent and vote to affirm.
This case provides another example of burdening New York City’s taxpayers with additional long-term financial responsibilities when the existing fiscal crisis makes it difficult for the city to meet its most basic needs. Of course, if the constitutional underpinning for the extraordinary and ingenious convoluted devices used were present, that would be the end of the matter for the courts. Ultimate questions of policy are for the Legislature as the majority opinion makes so clear. Yet the practical peril produced by constitutional error in this case should be recognized. The issues therefore are not simply legalistic.
The evil is not that the city will be supporting a valued museum, for that would not be evil at all. Had expenditures for the museum been included in the city budget, straightforwardly, and subject to review and adjustment each year, there would be no objection. The evil, instead, is that stripped of ingenious gimmickry the net result of the statutory scheme is to conceal from taxpayers, perhaps for the long future, and from those concerned with the city’s credit the permanent, unreviewable diversion of anticipated city tax revenues to the museum.
With this context in mind, the constitutional issues are addressed. In doing so, however, one should not be deceived by the "now you see it, now you don’t” sleight of hand practiced by the drafters of the challenged legislation.
*375 Section 1 of article XVI of the State Constitution provides: "Exemptions from taxation may be granted only by general laws.” The issue in this case is whether the challenged statutory exemption, tailored to apply to the Museum of Modern Art and to no other institution, is a general law merely because the museum is not explicitly designated by name. A subsidiary issue is whether the legislative attempt to vest the right of local approval of the City Cultural Resources Act in the Board of Estimate rather than the city’s legislative body, the city council, is a violation of the home rule article of the State Constitution (NY Const, art IX, §§ 2, 3).
The melange of other issues raised by plaintiff requires no discussion. As to those, there is agreement with the majority. In particular, it is obvious that an expansion of an important museum is a public use for which the grant of eminent domain power may be appropriate. This would be true even if the expansion were accompanied by incidental use for revenue producing purposes (see Courtesy Sandwich Shop v Port of N. Y. Auth., 12 NY2d 379, 390, app dsmd 375 US 78, mot for reh den 375 US 960). The Museum of Modern Art is a great cultural institution, and its expansion would enrich the entire State, if not the Nation. As with other great nonprofit cultural institutions, conscious public support in one legal form or another is justified.
Although the taxation article of the State Constitution was not added until 1938, the constitutional prohibition against tax exemption, except by general law, dates from 1901, when section 18 of article III (now § 17) of the Constitution was amended to provide: "The legislature shall not pass a private or local bill * * * Granting to any person, association, firm or corporation, an exemption from taxation on real or personal property.” This restriction on the legislative power was initiated by the Legislature itself, weary of the constant attempts to secure tax exemptions by private bill (3 Lincoln, Constitutional History of New York, pp 680-681; 7 New York State Constitutional Convention Committee [1938], Problems Relating to Legislative Organization and Powers, p 84).
It is not disputed that the legislative history establishes that the challenged legislation was drafted with only the Museum of Modern Art in mind. Desired was a statute that would permit the museum to use its proposed westwing expansion as a pretext for building a tax-exempt 50-story tower, with the attendant burdens on the municipal services. Forty-four sto *376 ries would be used for private luxury condominium apartments, dwarfing the six stories allotted to the westwing. Enacted, after intensive lobbying efforts, were statutes general in terms, but containing restrictions making it evident that application would be and was intended to be limited to a single entity, like a private bill would be.
The challenged statutes, taken together, create the "trust for cultural resources of the city of New York”, and permit the trust, in conjunction with a participating museum, to build a facility to be used partly for museum purposes and partly for income-producing purposes. The "combined-use facility” would receive a real estate tax exemption. To qualify for participation, however, a museum must have had annual admissions of 500,000 for at least five years, and must have owned in fee for at least five years 50,000 square feet of tax-exempt real property contiguous to the museum. The Museum of Modern Art is the only institution in the City of New York that qualifies for participation. Since no legislation has been enacted creating similar trusts for any other municipality in the State, the Museum of Modern Art is the only institution in the State currently eligible to take advantage of the tax exemption.
Of course, that is as it was intended to be. The legislative history indicates unequivocally that the bills were intended to "apply to one institution and one institution only” (Transcript of Assembly Proceedings, June 29, 1976, Appendix on App, p A189). It was even argued that this limited application was a benefit, because a broader scope would make the bills an unwanted "diversion of tax money” (id., p A193).
Defendants argue that a statute does not run afoul of the constitutional limitation merely because it is applicable to a single entity. In this, they are correct. But that does not mean the Constitution may be evaded simply by writing into an exemption restrictions with no valid purpose other than to limit its application to the entity the Legislature intends to benefit.
A valid tax exemption statute would apply to a class of taxpayers. Of course, the class, in a rare case, could be a class of one, but definition of the class, whatever its size, would have to be "based on conditions common to a class and germane to the subject of the Act” (Stapleton v Pinckney, 293 NY 330, 335). There must be reasons, not just excuses, for including some taxpayers and excluding others.
*377 Thus, statutes which apply only to cities with population exceeding one million have been upheld as general although New York City is the only such city in the State (see Matter of McAneny v Board of Estimate & Apportionment of City of N. Y., 232 NY 377, 392-393). But that is because conditions in a city of such size, inevitably the center of a megalopolis, are demonstrably different from conditions in smaller cities. Health needs, housing and transportation needs, and other basic concerns may require greater or different attention in a city of that magnitude, and a statute with application limited to such large cities is not the less general because only one city in the State is sufficiently large to merit the different treatment (cf. Farrington v Pinckney, 1 NY2d 74, 83-85).
Always held unconstitutional, as not general, however, have been statutes written in general terms, but so tailored to apply only to a particular private or local interest (see Stapleton v Pinckney, 293 NY 330, 334-336, supra; Matter of Mayor of City of N. Y. [Elm St.], 246 NY 72, 75-79; Matter of Henneberger, 155 NY 420, 424-428). Thus, in the Henneberger case, a highway statute was expressed in general terms, but so restricted by conditions and exclusions as to be applicable only to a particular road in New Rochelle. "[T]o call this act a general law would be absurd”, said the court, treating with the requirements of section 18 (now 17) of article III of the State Constitution (155 NY, at p 427). "That the present act is expressed in general terms is not, and should not be, decisive of the question of its constitutionality. That is a question which must be decided not by the letter, but by the spirit, of the act” (id., at p 425).
Similarly in the more recent Stapleton case, the court held invalid, as in violation of the same constitutional prohibition, an act relating to jurors in counties with a population of 200,000 to 250,000, containing a city of at least 125,000 population. The court looked past the "general” language of the act and recognized that it could apply only to the County of Albany. Citing the Henneberger case, Judge Lehman wrote that a statute could not be considered general "where attempted 'classification’ is based on conditions 'which cannot be recognized as common to a class’ and have no reasonable relation to the subject. In such case there is in truth no 'class’ created but merely identifying marks of the locality or localities for which the Legislature is enacting a special law” (293 NY, at p 335).
*378 The long-established rule governs in this case. The odd circumscription used in the now-challenged legislation serves only as an "identifying mark” for the singular Museum of Modern Art and its proposed expansion. No convincing explanation is offered for the requirement that 50,000 square feet of tax-exempt land be owned in fee for at least five years before participation is permissible. The square footage requirement is arbitrary, because any museum property, no matter how small, might be underutilized and suitable for improvement to benefit the public. The fee ownership requirement bears not at all on the question of underutilization, for some institutions might lease underutilized property for a long term at a nominal or substantial rental, quite common in the City of New York where some universities and churches own in fee numerous large parcels subject to century-long leases. The five-year requirement, concededly inserted to avoid having other museums purchase property with the intent of benefiting from the statute, substantiates the inescapable inference that the statute was to apply only to the museum. There could be little other reason for seeking to prevent other institutions from buying adjacent underutilized property for development purposes. In short, the requirements, taken together, were intended to apply to no reasonably defined class of institutions, but to the Museum of Modern Art alone. For that reason, the statute is unconstitutional.
The Legislature was, of course, patently aware that the bill before it was to benefit only the Museum of Modern Art. As one opponent noted during Assembly debate on the bill, "I don’t object to Mr. Siegel’s bill because it tries to help our cultural institutions in the City of New York which are responsible for bringing in more business and taxes than anything else we have in the City of New York. I am opposed to the bill because it gives to one institution, an institution that is wealthy, that can function, it gives them money to expand while there are many others throughout the City of New York that are in bad financial condition also” (Transcript of Assembly Proceedings, June 28, 1976, Appendix on App, p A184). And, as the Assembly sponsor acknowledged, "[t]he purpose is to allow the real estate taxes to be used to finance the expansion of the construction of the Museum.” (Id., p A183.) It is ludicrous to argue now that it was intended to have general application.
Appellants argue that since the challenged statute creates a *379 public benefit corporation, the Trust for Cultural Resources, the statute must be treated as a general one because the public at large is to benefit. The suggested rule would permit easy circumvention of the constitutional requirement that tax exemptions be granted only by general law, for it would permit the Legislature to deem a private or local matter to be of public interest, to create a public benefit corporation to purchase property or otherwise deal with the matter, and then to grant the public benefit corporation a tax exemption. That result is supported neither by logic nor by the cases cited by appellants.
True, there have been cases sustaining tax exemptions granted to property owned by public benefit corporations (see Wein v Beame, 43 NY2d 326; People ex rel. Buffalo & Fort Erie Public Bridge Auth. v Davis, 277 NY 292). But in none of those cases was the public benefit corporation set up to benefit primarily a single private institution, whether worthy as is the museum or not. More important, in none of those cases was the public benefit corporation set up as a dummy for the exclusive purpose of obtaining a tax exemption on a particular piece of property. Involved in each case was a public benefit corporation created with objectives and authority of greater breadth than the desire to benefit a single institution. The cases emphatically do not stand for the position that any legislation creating a public benefit corporation is a "general” law.
Nor is Bush Term. Co. v City of New York (282 NY 306, 317-322) of help to defendants. That case involved the tax status of real property owned by the Port Authority and used as a railroad terminal. No explicit tax exemption was granted, either by general or special law, so no question arose under the constitutional provisions litigated in the present case. Instead, in the Bush Terminal case, the issue was whether the unique nature of the Port Authority, an agency created by bi-State compact, required that its property be tax-exempt even in the absence of an explicit exemption statute (see id., at p 317).
Thus, since the challenged statutes purport to create a tax exemption by other than a general law, they should be held invalid. But the City Cultural Resources Act is invalid for another reason as well. The Legislature, in enacting the bill, by its terms a special law applying only to New York City, provided that it should not take effect unless and until it was *380 approved by the New York City Board of Estimate. The decision to vest this right of approval in the Board of Estimate rather than the city’s legislative body, the city council, was a matter "in relation to the property, affairs or government of [a] local government”. Since there was no home rule message, and no certificate of necessity by the Governor, the bill was enacted in violation of section 2 of article IX of the State Constitution.
Not questioned is that the substance of the legislation relates to matters of State, not strictly local, concern. Museums serve an educational function, and, as with educational matters, there can be no question that support of a great museum is a matter of State concern.
At issue instead is the State’s usurpation of the local government’s prerogative to designate the local governmental body that should approve legislation that substantially affects the city’s future revenue. That the City Cultural Resources Act would have a special effect on the city cannot be disputed; the Legislature conceded as much by making enactment of the statute conditional on approval by the city Board of Estimate. In fact, the bill was defeated on the first vote taken by the Assembly, at least in part because it was believed that a home rule message was required. Only on the last day of the Legislature’s regular session was the bill passed by the Assembly, and then only after insertion of the provision requiring approval by the Board of Estimate.
Once it is decided that city approval is necessary, however, approval itself is strictly a matter of the "property, affairs or government” of the city. The city’s elected legislative body is the city council, and it should have been for the council to decide how the bill should be approved. The Legislature’s callous substitution of the Board of Estimate for the city council violates both the spirit and the letter of the home rule article. It is, in short, a gross interference with the distribution of powers in the city’s local government.
Thus, the statutory scheme is unconstitutional. But that is not the whole of it. No constitutional provision was ever created nor is it ever to be interpreted without reading into it the effect of its violation. Constitutional provisions reflect a history of experience and mistrust of transient action dictated by transient necessities which may, as in the past, engender ultimate destruction for the society it is supposed to protect. *381 The scheme, as noted, deprives the city’s coffers of needed tax revenue for the foreseeable future.
Once the proposed apartment tower is built and the tax exemption granted, even the most serious of fiscal crises might not permit the city to re-evaluate priorities. Even now, in a time of financial difficulty for municipalities in general and New York City in particular, substantial public support for an important museum may be thought beneficial or even essential. But it should not be for the Legislature to decide, by grant of a tax exemption in violation of the State Constitution, that the museum will be entitled to priorities, hidden because not subject to review in the annual budget, over other needs in the decades to come. That, in short, is what this legislation would do. But worse, it would become a "legal” precedent.
Accordingly, I dissent and vote to affirm.
Judges Jones, Wachtler, Fuchsberg and Cooke concur with Judge Gabrielli; Chief Judge Breitel dissents and votes to affirm in a separate opinion in which Judge Jasen concurs.
Order reversed, etc.