HOTEL DORSET COMPANY, Appellant, v TRUST FOR CULTURAL RESOURCES OF THE CITY OF NEW YORK et al., Respondents.

First Department, July 13, 1978

159

## APPEARANCES OF COUNSEL

*Arthur Richenthal* of counsel *(Richenthal, Abrams & Moss,* attorneys), for appellant.

*Alfred Weinstein* of counsel *(L. Kevin Sheridan* with him on the brief; *Allen G. Schwartz, Corporation Counsel),* for Mayor of the City of New York, respondent.

*Manly Fleischmann* of counsel *(Webster & Sheffield,* attorneys), for Trust for Cultural Resources, respondent.

*Shirley Adelson Siegel* of counsel *(Samuel A. Hirshowitz*

with her on the brief; *Louis J. Lefkowitz, Attorney-General),* in his statutory capacity under section 71 of the Executive Law.

## OPINION OF THE COURT

SULLIVAN, *J.*

At issue is the constitutionality of two separate but related statutes enacted together by the State Legislature: sections 301 through 323 of article 13-E of the General Municipal Law, known as the New York State Cultural Resources Act (SCRA) (L 1976, ch 902), and sections 325 through 331 of article 13-F of the General Municipal Law, known as the New York City Cultural Resources Act (CCRA) (L 1976, ch 903, as amd by ch 904).

Plaintiff contends that the challenged statutes are special interest laws which unconstitutionally grant tax exemptions and condemnation powers for the benefit of a private corporation, the Museum of Modern Art (MOMA), through the artifice of the Trust for Cultural Resources of the City of New York (Trust). We agree.

For some insight into the background of this legislation, we quote from MOMA's biennial report covering the years 1974 to 1976, signed by its director:

"In the fall of 1975, after long study and analysis, the Museum announced a highly innovative proposal to deal with the seemingly intractable problems of its financial situation and need for additional space. In essence, the plan proposed the creation through State legislation of a Trust for Cultural Resources which would be empowered to arrange for the development of the Museum's valuable air rights by constructing a condominium apartment tower. The tower would be built over a new Museum wing to the west of the existing building: this wing would approximately double the Museum's present gallery space and provide other new facilities. The Trust would be empowered to receive the equivalent of real estate taxes on the condominium and convey these payments to the Museum, providing substantial new revenues for the Museum's support. * * *

"There are many hurdles to be overcome before this exciting project can be realized. However, one vital stage was accomplished in the final month of the period of this report,

when the legislation establishing the Trust for Cultural Resources was passed by the State legislature."

The concept was to obtain revenues for MOMA's benefit from rental income, profits realized on the sale of the apartments, and "tax-equivalency payments" to be paid to the Trust in lieu of real estate taxes which would have been paid to the city on the luxury apartment tower (to be 44 stories).

To achieve this diversion of tax revenues for the city to MOMA, special legislation was required because the residential or commercial portion of MOMA's property would not be exempt from real estate taxes even if the revenue produced by such properties were used to support the museum. The enactment of legislation designating MOMA as the sole beneficiary would on its face run afoul of the constitutional prohibition against granting tax exemptions except by "general law." (NY Const, art XVI, § 1.)[1] Section 3 (subd [d], par [1]) of article IX of the State Constitution defines a general law as one "which in terms and in effect applies alike to all counties * * * all cities, all towns or all villages."

MOMA currently owns the brownstones adjoining the museum on the east. This property is being used for cultural purposes. Since the proposed apartment tower is to be built over a museum wing to be constructed on the west side of the existing building, the acquisition of the adjoining properties to the west of its existing facilities was required. These properties are located at 29, 31 and 33-35 West 53rd Street. Plaintiff, the owner of a hotel at 30 West 54th Street, which abuts MOMA's proposed development, owns an easement on 29 West 53rd Street. Hence, condemnation powers were needed to assure acquisition of these adjoining properties and extinction of plaintiff's air rights, both for the expansion of museum facilities and the construction of the luxury tower.

The first of the challenged statutes, SCRA, applicable on its face to cities thoughout the State, authorizes creation for each city by "special law" of "trusts for cultural resources" which are denominated public benefit corporations.

The second, CCRA, is a special law creating a "trust for cultural resources for the City of New York." This is the trust referred to earlier. This special law is limited to museums and on its face, at least, applies generally to museums in the city.

___

1. "Exemptions from taxation may be granted only by general laws."

CCRA is the only special law that has been enacted by the Legislature pursuant to SCRA.

SCRA and CCRA together authorize the Trust and a "participating cultural institution" to develop "combined-use facilities", consisting of the institutional portion, such as a museum, and a noninstitutional portion, such as income-producing luxury apartments. Through the medium of the Trust, the entire facility becomes exempt from the payment of real estate taxes. The owners of the residential or commercial portions of combined-use facilities would make tax-equivalency payments to the Trusts in amounts equivalent to the real estate taxes they otherwise would pay to the local government. These tax-equivalency payments would be used to support the museum.

The infirmity in this statutory scheme is its eligibility requirements which are so restrictive that within the entire State of New York only MOMA qualifies as a "participating cultural institution" with which the Trust may enter into an agreement for the development of "combined-use facilities." Nor is there any reasonable possibility that another cultural institution would ever become eligible.

SCRA-CCRA defines a "participating cultural institution" as a nonprofit institution which: (a) operates a museum in the city (General Municipal Law, § 325, subd 3, par [i]); (b) owns fee title to contiguous tax-exempt real property of more than 50,000 square feet for at least five years (General Municipal Law, § 307, subd 1; § 325, subd 3, par [ii]) and (c) has average annual admissions of at least 500,000 persons for at least five years (General Municipal Law, § 325, subd 3, par [iii]).[2]

The requirement of ownership for at least five years in fee simple of more than 50,000 square feet "contiguous tax-exempt real property" is no insignificant hurdle. While other nonprofit institutions such as the Metropolitan Museum of Art and the American Museum of Natural History can meet the requirement of 500,000 average annual admissions for a five-year period, these institutions cannot qualify because they do not own in fee simple the requisite real property.

---

2. Although SCRA provides for lower minimum annual admission requirements in cities having a population of less than one million, no nonprofit institution in the State can be a "participating cultural institution" unless it owns in fee simple more than 50,000 square feet of "contiguous exempt real property" for at least five years (General Municipal Law, § 307, subd 1). MOMA is the only "cultural institution" in the entire State and the only museum in the city that meets this criterion.

The purpose of SCRA-CCRA was to create an exemption from city real estate taxes on the luxury residential tower. This tax exemption is critical because the tax-equivalency payments will be paid to the Trust to underwrite MOMA's expansion and operating budget.

SCRA provides that the real property and improvements of a combined-use facility, including the institutional (museum) and the noninstitutional (residential or commercial building) portions, "shall be exempt from real property taxation from and after the date on which such real property has first been conveyed to the trust" (General Municipal Law, § 317, subd 2).[3]

As long as the real property of the noninstitutional portion of the facility is exempt from real property taxation, the owners of such residential or commercial building are to make the tax-equivalency payments to the Trust. The payments are to be in an amount at least equal to the real estate taxes which would be paid on the building were it not for the real estate tax exemption. The method of calculation and use of the tax-equivalency payments are to be determined by the special law creating the Trust (General Municipal Law, § 307, subd 3).

CCRA in turn provides that there shall be a full exemption from any tax-equivalency payments during construction, and a sliding scale exemption during the 10-year period after completion of construction (General Municipal Law, § 330, subd 2).

For a fuller appreciation of the true dimension of SCRA's tax exemption provisions, some analysis of one aspect of the scheme is warranted. This is not a statute which provides a tax exemption on property owned by a public-benefit corporation. The exemption attaches when the Trust momentarily acquires title to or interest in the real property on which any part of the combined-use facility is to be constructed. (General Municipal Law, § 317, subd 2.) This exemption will survive the

---

**3.** SCRA also provides that all property, revenues and income of the Trust "shall be exempt from taxation" (General Municipal Law, § 317, subd 2) and contains a covenant by the State, not repealable, that all bonds and notes issued by the Trust and the interest thereon, and all of the properties and revenues of the Trust "shall at all times be free from income and other taxation" (General Municipal Law, § 317, subd 3). Such bonds and notes may be issued to finance any of the corporate purposes of the Trust, and thus they may be used to underwrite the cost of the residential or commercial portion of a combined-use facility, as well as its institutional portion (General Municipal Law, § 309, subd 1).

conveyance of the Trust's interest to the private owners of the luxury apartment tower. Since there is no termination date, this tax exemption may continue in perpetuity. Although the luxury apartment tower owners will, after 10 years, be paying the equivalent of the real estate taxes they would otherwise be subject to, these payments will be made to the Trust for MOMA, rather than to the city treasury.[4] Thus, not only will the city be losing tax revenues from this valuable 44-story luxury apartment tower but the burden of providing the municipal services which its occupancy will entail will be on the backs of the taxpayers. Moreover, under the exemption plan, the private owners will receive a partial tax abatement for at least 10 years.

Plaintiff raises three constitutional objections to the legislation:

1. SCRA is not a general law but a special law. Tax exemptions may be granted only by general law.

2. The exercise of the condemnation power must be for a "public use." No public use is involved here.

3. The Legislature violated article IX of the State Constitution by enacting a special law without a home rule message from the City Council.

If any one of the objections has merit, SCRA-CCRA must fail. We believe that the legislation is defective on all three grounds.

■ Whether a statute is a general law is a judicial issue. (See *Greene v Dunscomb,* 281 NY 261; *Stapleton v Pinckney,* 293 NY 330; *Matter of Holland v Bankson,* 290 NY 267.)

The Court of Appeals has had occasion to consider whether a law is general or special. In *Matter of Henneberger* (155 NY 420, 425-426) the court stated: "That the present act is expressed in general terms is not, and should not be, decisive of the question of its constitutionality * * * Although this act is drawn in general terms, if its provisions are such in number and in character as unduly, with reference to the constitutional purpose, to restrict its operation and, to all intents, to confine it to a particular locality, then, I think, it comes as

---

4. The argument that SCRA's tax exemption for the private owners of MOMA's luxury tower is justified on the ground that the support of a museum through tax-equivalency payments is no different from the long-established practice of direct appropriations of tax revenues for cultural institutions, ignores the constitutional mandate that tax exemptions be granted by general laws.

much under condemnation, as though it designated the locality by name."

Chief Judge CARDOZO stated it best: "We close our eyes to realities if we do not see in this act the marks of legislation that is special and local in terms and in effect. This group of conditions so unusual and particular is precisely fitted to the claimant's case, and only by a most singular coincidence could be fitted to any other." *(Matter of Mayor of N. Y. [Elm St.],* 246 NY 72, 77-78.)

Any doubt as to whether these statutes were intended to benefit only MOMA is dispelled by the history of the legislation. The bills which eventually became SCRA-CCRA were treated as one indivisible legislative package "to finance the necessary expansion of the Museum." The bills' sponsor stated: "The purpose [of the legislation] is to allow the real estate taxes to be used to finance the expansion of the construction of the Museum."

Respondents, in fact, concede that only MOMA fits all the statutory eligibility criteria for a participating cultural institution. And we can discern no rational basis for the requirement of ownership of more than 50,000 square feet of contiguous tax-exempt real property, except to confine the application of SCRA solely to MOMA (which has owned more than the required square footage for at least five years), and to exclude every other cultural institution. Similarly, we can find no rational purpose to justify the requirement that the contiguous property be tax exempt, except to limit the class to one.[5]

Equally significant is the fact that CCRA, the only special law enacted pursuant to the authority conferred by SCRA, limits the Trust's condemnation power to a metes and bounds description of the private properties adjoining MOMA's property on the west. This is the same property designated for the construction of MOMA's combined-use facility.

■■ It is no answer to argue, as do respondents, that SCRA is a general law because, in theory, the statute may at some future time apply to institutions other than MOMA. For a statute to be deemed applicable to a class, and thus be viewed as a general law, there must be a reasonable prospect that

---

5. Any argument that the reason for excluding nonexempt realty is to prevent the loss of existing real estate tax revenues must fail. SCRA-CCRA easily avoid such a result by providing that the Trust continue to pay to the city the equivalent of real estate taxes previously paid with respect to taxable property acquired through eminent domain. (General Municipal Law, § 330, subd 1, par [b].)

more than one member will constitute the class in the foreseeable future. (Cf. *Matter of Mayor of N. Y. [Elm St.], supra,* pp 72, 78.) Here, no one may join the class for at least five years from the effective date of the legislation, at the earliest. If SCRA ever does apply to a class consisting of more than MOMA, it most likely will be by a congruence of fortuitous phenomena and not as the realization of a reasonable prospect, which is the standard required of a general law in order to be constitutional. We find that SCRA is "a local law masquerading as general" *(Farrington v Pinckney,* 1 NY2d 74, 81), the effect of which is to create a purported classification in name only.

It is also argued that, inasmuch as the purpose of SCRA is to aid education and culture, which are matters of State concern, the statute is, *ipso facto,* a general law which meets the constitutional requirement for the granting of a tax exemption. (See *Ferguson v Ross,* 126 NY 459; *Robertson v Zimmermann,* 268 NY 52.) This argument is easily disposed of, as it seems to reflect a confusion in constitutional doctrine between tax exemption and home rule. (See NY Const, art IX, § 2, subd [b], par [2].) A general law for tax-exemption purposes is one which in terms and effect applies alike to all members of a class. A general law for purposes of determining whether a home rule message is needed is one which serves a legitimate State-wide purpose. But the tests are not interchangeable, and the mere fact that the State may have an interest in education and culture does not permit the Legislature to grant a tax exemption to one designated private museum.

Nor are SCRA and CCRA made general laws because the statutes create a public benefit corporation, the Trust, to carry out a matter of State concern. (See *People ex rel. Buffalo & Fort Erie Public Bridge Auth. v Davis,* 277 NY 292.) The real property tax exemption granted by this legislation extends beyond Trust ownership and runs to the private owners of the luxury apartment tower.

On the basis of legislative history, the restrictive qualification requirements for a participating cultural institution and its integration with CCRA, we conclude that it was the purpose and intent of SCRA to apply to MOMA, to the exclusion of any other institution. Behind the facade of a general law "[a] misshapen congeries of accidents has been made to mas-

quarade under the semblance of a class." *(Matter of Mayor of N. Y. [Elm St.], 246 NY 72, 79, supra.)*

■ ■ SCRA-CCRA's grant of condemnation powers to the Trust also offends constitutional doctrine since it is the "universally established rule that private property can constitutionally be taken by eminent domain only for a public use" (2A Nichols, The Law of Eminent Domain [3d ed], § 7.1, p 7-4.1), a principle firmly imbedded in our State and Federal Constitutions. It is "well settled that whether or not a proposed condemnation is for a public purpose is a judicial question". *(Denihan Enterprises v O'Dwyer, 302 NY 451, 457.)* "A determination of public purpose must be made by the courts themselves" *(Yonkers Community Dev. Agency v Morris, 37 NY2d 478, 485)* and legislative findings of public use "are not conclusive on the courts." *(Matter of New York City Housing Auth. v Muller, 270 NY 333, 339.)*

On its face we do not have here a taking for a school, park, hospital, highway, or port facility, functions traditionally performed by government. No one questions the fact that a cultural institution such as MOMA serves a public purpose. But the expressions "public interest" and "public use" are not synonymous. *(Matter of Niagara Falls & Whirlpool Ry. Co., 108 NY 375, 385.)* Certainly SCRA-CCRA's grant of condemnation power to expand a privately owned facility for the combined use of museum expansion and the construction of a 44-story privately owned luxury apartment tower is an unusual and unprecedented grant of the condemnation power. We have serious doubts as to the wisdom of extending the power of eminent domain to a taking for any private enterprise which has some color of public interest.

We need not, however, reach the question whether a private museum's expansion is a public use because we find that the taking is for a project, the dominant purpose of which is revenue production. The power of condemnation cannot be authorized or exercised where the revenue production motive or some other nonpublic purpose is dominant rather than incidental. *(Denihan Enterprises v O'Dwyer, supra; Matter of Niagara Falls & Whirlpool Ry. Co., supra.)*

At least 83% of the tower will contain luxury apartments which will produce substantial revenues. Only the bottom six stories of the building will not contain apartments, but will have, in addition to gallery space, restaurants and a bookstore, which will also produce revenue. Thus, it is estimated

that no more than 17% of the building will be used for nonrevenue producing purposes. While it could be argued that all the revenue from the tower will be used for support of the museum, it is clear that the tower itself will function as an apartment house, and not as a cultural institution.

In order to justify its condemnation authority, the Trust must show both that the dominant motive for construction of the tower is not revenue production, and that the over-all utilization of the structure serves a public purpose. The Court of Appeals rejected challenges to the constitutionality of legislation authorizing development of the World Trade Center by finding that on a space allocation basis "two thirds of the space within the center is planned for the use of tenants directly involved in World Trade purposes". (*Matter of Port of N. Y. Auth.,* 18 NY2d 250, 254; see, also, *Courtesy Sandwich Shop v Port of N. Y. Auth.,* 12 NY2d 379.) Here, a relatively small amount of space in the proposed tower will be functionally related to museum purposes. Thus, on the basis of the revenue producing aspects of the project, along with the fact that most of the building will be used by private residents and not by the public, we find that the purpose of the taking is not a public use.

Finally CCRA, a "special law" by its own terms, was enacted without a home rule message. The pertinent home rule provision of section 2 (subd [b], par [2]) of article IX of the State Constitution reads:

"Subject to the bill of rights of local governments and other applicable provisions of this constitution, the legislature * * * Shall have the power to act in relation to the property, affairs or government of any local government only by general law, or by special law only (a) on request of two-thirds of the total membership of its legislative body or on request of its chief executive officer concurred in by a majority of such membership".

■ The question then is whether CCRA, a special law on its face, is an act "in relation to the property, affairs or government" of New York City, because if it is, a home rule message was required. In our view, the substantive provisions of CCRA, which have as their purpose assistance to a beleaguered MOMA, are not of State concern to such a substantial degree as to be outside the scope of the term "property, affairs or government of any local government". That being so, the constitutional safeguard of local autonomy provided by section

2 (subd [b]) of article IX was violated by the following provision of CCRA: "This act [CCRA] shall take effect immediately, provided, however, that the provisions of this act shall not become operative unless and until the board of estimate, within ninety days after its enactment into law, adopts a resolution ratifying and approving the provisions hereof." (L 1976, ch 903, § 2, as amd by L 1976, ch 904, § 1.)

Respondents seek to justify the Legislature's provision for Board of Estimate ratification of CCRA on the ground that subdivision 4 of section 67 of the New York City Charter reserves to the board "final authority respecting the use, development and improvement of city land." CCRA involved more than the issue of the "use, development and improvement of city land" which requires only Board of Estimate approval. It was a special law on its face, affecting the property and affairs of a local government and thus required a home rule message. Only the City Council is vested with the legislative power of the city (NY City Charter, ch 2, § 21) and the Legislature may not, in the guise of seeking ratification of a purported project respecting the use, development and improvement of city land, circumvent the rightful authority lodged in the City Council.

Accordingly, the order of Supreme Court, New York County (HELMAN, J.), entered January 5, 1978, granting defendant's motion for summary judgment dismissing the complaint should be reversed, on the law, without costs or disbursements, and summary judgment granted to plaintiff declaring the challenged legislation unconstitutional.

LUPIANO, J. P., and LANE, J., concur with SULLIVAN, J.; SANDLER, J., dissents and would affirm for reasons stated by HELMAN, J.

Order, Supreme Court, New York County, entered on January 5, 1978, reversed, on the law, without costs and without disbursements, and summary judgment granted to plaintiff declaring the challenged legislation unconstitutional.