[836 NYS2d 40]

THE PEOPLE OF THE STATE OF NEW YORK, by ELIOT SPITZER, Attorney General of the State of New York, Respondent, v RICHARD A. GRASSO, Appellant, et al., Defendants. (And Other Actions.)

First Department, May 8, 2007

---

**APPEARANCES OF COUNSEL**

*Williams & Connolly LLP*, Washington, D.C. (*Gerson A. Zwei-fach, Brendan V. Sullivan, Jr., Victoria Radd Rollins, Steven M. Farina* and *Carl R. Metz* of counsel), and *Flemming Zulack Wil-liamson & Zauderer LLP*, New York City (*Mark C. Zauderer* and *Jonathan D. Lupkin* of counsel), for appellant.

*Andrew M. Cuomo, Attorney General*, New York City (*Avi Schick* and *David Axinn* of counsel), for respondent.

**OPINION OF THE COURT**

McGuire, J.

The central issue on this appeal is whether the Attorney General has the legal authority to assert against defendant Richard A. Grasso four of the six causes of action that the Attorney General asserts against him in his complaint.[1] Although these four causes of action, the first, fourth, fifth and sixth causes of action, refer to and rely on various provisions of the Not-For-Profit Corporation Law (N-PCL), neither the N-PCL nor any other statute purports to confer authority upon the Attorney General to assert any of them. Indeed, none of them are mentioned in, let alone defined by, the N-PCL or any other statute, and Grasso's position at bottom is that none of them are valid causes of action. By contrast, the N-PCL expressly recognizes the other two causes of action—the second and third causes of action—the Attorney General asserts against Grasso, and they are among the causes of action the N-PCL expressly authorizes the Attorney General to bring. We conclude that the

---

1. In addition to these six causes of action, the complaint asserts a seventh cause of action against Kenneth G. Langone, a former director of defendant New York Stock Exchange, Inc. (NYSE), and an eighth cause of action against the NYSE.

Attorney General does not have the authority to assert the first, fourth, fifth and sixth causes of action. Regardless of whether the Attorney General's authority to bring causes of action against directors and officers of not-for-profit corporations relating to the affairs of the corporations is limited to the causes of action the Legislature expressly has authorized the Attorney General to bring, these four causes of action are not within the scope of the Attorney General's authority. As discussed below, the assertion of these causes of action is inconsistent with the policy judgments made by the Legislature in enacting the N-PCL and, specifically, both with core provisions of the N-PCL relating to the duties and liability of officers and directors and with the enforcement scheme of the N-PCL.

The second cause of action is premised on N-PCL 720 (a) (2), which expressly authorizes a cause of action against an officer or director of a not-for-profit corporation "[t]o set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness." Moreover, the same statute expressly authorizes the Attorney General, the corporation and, in the right of the corporation, directors, officers and others, to bring such a cause of action (N-PCL 720 [b]). According to the second cause of action, the payment to Grasso of annual compensation and certain other benefits represented "unlawful conveyance[s], assignment[s] or transfer[s] of corporate assets." The necessary allegation that these payments were unlawful rests on the provisions of N-PCL 202 (a) (12) and 515 (b). The former provision authorizes not-for-profit corporations to, inter alia, fix the "reasonable compensation" of officers and directors and specifies that "[s]uch compensation shall be commensurate with services performed" (N-PCL 202 [a] [12]); the latter provision makes clear what could not be doubted in any event: that the prohibition of N-PCL 515 on the payment by a not-for-profit corporation of dividends or "any part of its income or profit to its members, directors, or officers" (N-PCL 515 [a]) does not apply to the payment of "compensation in a reasonable amount to members, directors, or officers for services rendered" (N-PCL 515 [b]). Thus, to prevail on this claim and secure a judgment both setting aside these payments and directing Grasso to return them, the Attorney General is required to prove that the payments were "unlawful" (i.e., not "reasonable" compensation "commensurate with services performed") and that Grasso "knew of [their] unlawfulness" (N-PCL 720 [a] [2]).

The third cause of action is premised, in the first instance, on N-PCL 720 (a) (1) (A) and (B). These provisions expressly authorize an action against an officer or director:

> "(1) To compel the defendant to account for his official conduct in the following cases:

> "(A) The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge.

> "(B) The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties."

Like the second cause of action, this cause of action is among the causes of action that N-PCL 720 expressly authorizes the Attorney General, the corporation and specified others (including, in the right of the corporation, a director or officer) to bring against an officer or director of the corporation. The scope of the duties of directors and officers is defined by paragraph (a) of N-PCL 717. In relevant part, it provides that "[d]irectors and officers shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions." In addition, this statute stipulates that "[i]n discharging their duties, directors and officers, when acting in good faith, may rely on information, opinions, reports or statements . . . prepared or presented" by various individuals, including fellow officers and directors and other agents of the corporation (N-PCL 717 [b]). Provided that they so rely in good faith, directors and officers "shall have no liability by reason of being or having been directors or officers of the corporation" (*id.*).

In short, as the Attorney General puts it in his brief, the third cause of action alleges that Grasso "violated his fiduciary duties to the NYSE under N-PCL 717 (a), 720 (a)-(b) by influencing and accepting awards of excessive compensation during his tenure as Chairman and CEO." In addition to seeking a judgment directing Grasso to account for the complained-of conduct, the third cause of action, like the second cause of action, seeks a money judgment. Specifically, it seeks "restitution to the NYSE of all payments to the extent [Grasso] fails to account for the lawfulness of such payments."

The first, fourth, fifth and sixth causes of action against Grasso, the ones at issue on this appeal, are described by the

Attorney General as "common law" causes of action. Grasso, however, describes them as "hybrid" causes of action, because "they expressly allude to the N-PCL, and according to the Attorney General, are brought as part of an effort to enforce that statute (and are therefore not pure common law claims) . . . ." How best to characterize these four causes of action is of no legal moment. For convenience, we will refer to them as the nonstatutory causes of action.

The first cause of action, "for Imposition of a Constructive Trust and Restitution," relies on the provisions of the N-PCL authorizing the payment of "reasonable" compensation (N-PCL 202 [a] [12]; 515 [b]) which "shall be commensurate with services performed" (N-PCL 202 [a] [12]). It alleges that the annual compensation and other benefits Grasso received were neither "reasonable" nor "commensurate with the services performed," and asserts that to the extent these payments were not "reasonable" and not "commensurate with the services performed," they were "unlawful and *ultra vires* under N-PCL §§ 202 (a) (12) and 515 (b)," they were "against public policy," and they "unjustly enriched" Grasso, and that Grasso "cannot in equity and good conscience retain such payments."

In essence, this cause of action differs from the second cause of action under N-PCL 720 (a) (2) only in that it does not allege one of the essential elements of that cause of action, viz., that Grasso "knew of [the] unlawfulness" of the payments. Thus, the Attorney General necessarily contends in bringing the first cause of action that he is authorized to sue an officer or director of a not-for-profit corporation for the receipt of excess compensation and obtain a judgment requiring the officer or director to repay the amount of the excess compensation solely on the basis of a showing that the compensation is not "reasonable" and not "commensurate with [the] services performed." Neither knowledge of the unlawfulness of the payments nor any state of mind, fault-based or otherwise, on the part of an officer or director is required under the Attorney General's view of his authority.

The fourth cause of action differs from the first cause of action only in formal terms. Styled as a claim "for Payment Had and Received," the crux of this cause of action is that the annual compensation and other benefits Grasso received were "not reasonable and not commensurate with the services Grasso performed under N-PCL §§ 202 (a) (12) and 515 (b)." It goes on to allege that restitution of the "unlawful compensation" would promote the purposes of these two provisions of the N-PCL, and

that Grasso "has been unjustly enriched and . . . retention of the fruits of the unlawful compensation is against equity, good conscience and public policy." As with the first cause of action, the only factual showing that the Attorney General would have to make to recover from Grasso is that the annual compensation and other benefits were "not reasonable and not commensurate with the services Grasso performed."

The fifth cause of action relies on N-PCL 715, entitled "Interested directors and officers." It alleges that a majority of the entire board of directors did not approve either certain compensation payments Grasso had received or certain compensation payments Grasso had not received but claimed were owed to him under his 2003 employment agreement. For this reason, the fifth cause of action asserts that

> "[t]he Attorney General is entitled to judgment directing restitution by Grasso to the NYSE of all payments he received that lacked the required board of directors approval under N-PCL § 715 (f) and a declaration that any allegations by the NYSE board to make future payments lacking the required N-PCL § 715 (f) approval is void."

Although the fifth cause of action recites that it is brought "under N-PCL § 715 (f)," neither paragraph (f) nor any other provision of N-PCL 715 authorizes the Attorney General to bring suit against a director or officer. Paragraph (f) simply provides that "[t]he fixing of salaries of officers, if not done in or pursuant to the by-laws, shall require the affirmative vote of a majority of the entire board unless a higher proportion is set by the certificate of incorporation or by-laws." Other provisions of section 715 authorize the corporation itself, under specified circumstances, to "avoid the contract or transaction" between it and one or more of its directors or officers (N-PCL 715 [b]). However, when "good faith disclosure of the material facts as to the director's or officer's interest in the contract or transaction . . . is made to the directors . . . or known to the board or committee . . . authorizing such contract or transaction," the contract or transaction may not be avoided under section 715 (N-PCL 715 [b]). Absent such disclosure or knowledge, or if the vote or authorization of the interested director or officer

> "was necessary for the authorization of such contract or transaction at a meeting of the board or committee at which it was authorized, the corpora-

tion may avoid the contract or transaction unless the party or parties thereto shall establish affirmatively that the contract or transaction was fair and reasonable as to the corporation at the time it was authorized by the board, a committee or the members" (N-PCL 715 [b]).

As applied to the compensation that is the subject of the fifth cause of action, N-PCL 715 would authorize the NYSE to avoid the relevant transactions and agreement pursuant to which the compensation either was paid or is assertedly due if, inter alia, such "good faith disclosure of the material facts" were not made to the directors or such material facts were not known to them at the relevant times. In no event, however, could the NYSE avoid the contract or transaction if Grasso were to "establish affirmatively that the contract or transaction was fair and reasonable as to the corporation at the time [of its authorization]" (N-PCL 715 [b]). Although N-PCL 715 does not authorize the Attorney General to bring an action, he nonetheless contends that he is authorized to bring suit to avoid the relevant transactions and agreement without regard to whether they or any of them were "fair and reasonable" to the NYSE.

The sixth cause of action relies on N-PCL 716, which prohibits not-for-profit corporations from making any loans, "other than through the purchase of bonds, debentures, or similar obligations of the type customarily sold in public offerings, or through ordinary deposit of funds in a bank," to their directors or officers. This cause of action alleges that in 1995 and again in 1999 Grasso received payments from the NYSE representing "advance payments to Grasso of [certain] lump sum . . . benefits to which he was not entitled under his then existing employment agreements," which Grasso had agreed to repay "by agreeing that they would be deducted from the ultimate lump sum pension benefits payable when he retired." Alleging further that each payment was a loan prohibited by N-PCL 716, the complaint asserts that the Attorney General is entitled to judgment directing payment by Grasso of reasonable interest on each of the alleged loans.[2]

---

2. As the parties concede, at the time of the events alleged in the complaint the NYSE was a "board of trade," which is a Type A corporation under the N-PCL (N-PCL 1410 [b]). Pursuant to N-PCL 1410 (c) (2), a not-for-profit corporation that is a "board of trade . . . may make loans to its . . . directors or officers . . . in any case where its board of directors finds that the making of such loan will be in furtherance of its corporate purposes and for a lawful

Like the similar recitation in the fifth cause of action, the sixth cause of action recites that it is brought "[u]nder" N-PCL 716. Nonetheless, N-PCL 716 does not itself authorize the Attorney General or anyone else to bring suit for a violation of its terms. However, the N-PCL expressly authorizes an action for a violation of N-PCL 716. That is, N-PCL 720 (b) authorizes the Attorney General, the corporation, and, in the right of the corporation, its directors, officers and others, to bring actions for, inter alia, "the relief provided in . . . paragraph (a) of section 719." In turn, N-PCL 719 (a) provides for the joint and several liability to the corporation of directors who vote for or concur in any of five specified actions, including "[t]he making of any loan contrary to section 716" (N-PCL 719 [a] [5]). The making of a loan contrary to section 716, however, is not without more a violation of section 719. To the contrary, section 719 specifies that "[a] director or officer shall not be liable under this section if, in the circumstances, he discharged his duty to the corporation under section 717" (N-PCL 719 [e]). As noted, N-PCL 717 accords directors and officers a good faith defense.

Thus, the sixth cause of action differs from a cause of action under N-PCL 719 (a) (5) against a director who votes for or concurs in the making of a loan contrary to N-PCL 716 that the Attorney General is authorized by N-PCL 720 (b) to bring. The sixth cause of action asserts a right to recover against Grasso without regard to whether, "in the circumstances," he discharged the duties imposed on him by N-PCL 717. It also differs from another cause of action recognized by the N-PCL that can arise from the making of a loan contrary to N-PCL 716. As noted, an action may be brought against a director or officer "[t]o set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness" (N-PCL 720 [a] [2]). Thus, to the extent that the director or officer who receives such a loan "knew of its unlawfulness," the N-PCL authorizes a cause of action against the director or officer. The sixth cause of action differs from this statutory cause of action, which the Attorney General is authorized to bring (N-PCL 720 [b]), in that it asserts a right to recover

---

public or quasi-public purpose." On this appeal, the parties disagree as well about whether the sixth cause of action should be dismissed because the complaint does not allege that the 1995 and 1999 payments were not authorized pursuant to N-PCL 1410 (c) (2).

against Grasso without regard to whether he "knew of [the] unlawfulness" of the two transactions.[3]

Before discussing the legal issue upon which this appeal turns, N-PCL 112 and other provisions of the N-PCL conferring enforcement authority upon the Attorney General must be noted. Section 112, "Actions or special proceedings by attorney-general," authorizes the Attorney General to maintain the actions or special proceedings specified in the nine subparagraphs of paragraph (a). That authority includes the authority to: "annul the corporate existence or dissolve a corporation that has acted beyond its capacity or power or to restrain it from carrying on unauthorized activities" (N-PCL 112 [a] [1]), "annul the corporate existence or dissolve any corporation that has not been duly formed" (N-PCL 112 [a] [2]), "procure a judgment removing a director of a corporation for cause" (N-PCL 112 [a] [4]), "dissolve a corporation under article 11 [of the N-PCL]" (N-PCL 112 [a] [5]), "enforce any right given under [the N-PCL] to members, a director or an officer of a Type B or Type C corporation" (N-PCL 112 [a] [7]), and, upon the issuance of a court order, "to enforce any right given under [the N-PCL] to members, a director or an officer of a Type A corporation" (N-PCL 112 [a] [9]).[4]

In addition, N-PCL 720 (b) authorizes the Attorney General to bring against directors the five causes of action specified in subparagraphs (1) through (5) of paragraph (a) of N-PCL 719—including, as discussed, an action for the "making of any loan contrary to section 716" (N-PCL 719 [a] [5])—and the four causes of action in subparagraphs (1) through (3) of paragraph (a) of N-PCL 720—including, as discussed, the second and third

---

**3.** To the extent a director or officer, in receiving a loan in violation of N-PCL 716, thereby acquires "corporate assets due to any neglect of, or failure to perform, or other violation of his duties" (N-PCL 720 [a] [1] [B]), the Attorney General similarly is authorized to bring an action against the director or officer (N-PCL 720 [b]). As is evident, the sixth cause of action asserts a right to recover against Grasso without regard to whether he acquired the two payments "due to" any such violation of his duties.

**4.** As is evident from a comparison of subparagraphs (7) and (9) of paragraph (a) of N-PCL 112, the Legislature decided to grant the Attorney General a greater role in the affairs of Type B and Type C not-for-profit corporations than in the affairs of Type A not-for-profit corporations like the NYSE. The Attorney General has plenary authority to bring an action to enforce any right given by the N-PCL to members, directors or officers of Type B or Type C corporations (N-PCL 112 [a] [7]), but must obtain judicial approval before bringing an action to enforce any of the rights given by the N-PCL to members, directors or officers of Type A corporations (N-PCL 112 [a] [9]).

causes of action alleged by the Attorney General. Finally, in connection with mergers, dissolutions and foreign corporations, various other sections of the N-PCL grant powers and assign responsibilities to the Attorney General (*see e.g.* N-PCL 907, 1008, 1214, 1216, 1303).

At one level, the issue in this case is whether the Attorney General is authorized to bring causes of action against directors and officers of not-for-profit corporations other than the causes of action the Legislature expressly authorized the Attorney General to bring. Under "the standard canon of construction of *expressio unius est exclusio alterius,* we can infer that the expression of [authority to bring specific causes of action] indicates an exclusion of others" (*Morales v County of Nassau,* 94 NY2d 218, 224 [1999]; *see also In re Wrublik,* 312 BR 284, 287 [2004] [applying "the legal maxim, *Expressio unius est exclusio alterius,* or, as it is otherwise worded, *expressum facit cessare tacitum.* That is, the express mention of one thing implies the exclusion of another"]).

The Attorney General argues both that the four nonstatutory causes of action reflect traditional common-law powers of the Attorney General and that the enactment of a statute relating to those common-law powers does not extinguish them unless the statute expressly limits the Attorney General's authority. With respect to the first of these arguments, however, the Attorney General does not cite any authority supporting the proposition that the Attorney General enjoyed common-law authority to bring causes of action comparable to the four nonstatutory causes of action. The Attorney General's supervisory powers over not-for-profit corporations, moreover, afford no support. As this Court has stated, the Attorney General's "[s]tanding to sue and supervisory powers are entirely separate legal principles" (*Lefkowitz v Lebensfeld,* 68 AD2d 488, 497 [1979], *affd* 51 NY2d 442 [1980]).

As for the latter argument, it essentially urges that "the standard canon of construction of *expressio unius est exclusio alterius*" (*Morales v County of Nassau,* 94 NY2d at 224) is not applicable when a statute conferring powers upon the Attorney General is being construed. The Attorney General, however, neither provides a reason why his powers can be limited only by the express terms of statutes nor cites any authority in support of that position. Indeed, the one decision the Attorney General does cite, *People v Kramer* (33 Misc 209, 213 [Ct Gen Sess of Peace, NY County 1900]), is to the contrary:

"As the powers of the attorney-general were not conferred by statute, a grant by statute of the same or other powers, would not operate to deprive him of those belonging to the office at common law, unless the statute, *either expressly or by reasonable intendment,* forbade the exercise of powers not thus expressly conferred" (quoting *People v Miner,* 2 Lans 396, 399 [Sup Ct, Gen Term 1868] [emphasis added and internal quotation marks omitted]).

Whether the Attorney General has any authority to bring causes of action against directors and officers of not-for-profit corporations other than the causes of action the Legislature expressly authorized the Attorney General to bring is an issue we need not and should not resolve.[5] Rather, the narrower issue that must be resolved is whether the N-PCL, "by reasonable intendment" (*People v Kramer,* 33 Misc at 213), forbids the four nonstatutory causes of action—i.e., "the exercise of powers not thus expressly conferred" (*id.*). As Grasso contends, two decisions of the Court of Appeals, *Sheehy v Big Flats Community Day* (73 NY2d 629 [1989]) and *Mark G. v Sabol* (93 NY2d 710 [1999]), are particularly relevant to its resolution.

In *Sheehy,* the issue was whether a private right of action in favor of intoxicated minors fairly could be implied from the statutory prohibition, contained in Penal Law § 260.20 (4) (now [2]), on furnishing alcoholic beverages to persons under the legal purchase age. Its resolution turned on the third prong of the three-part test set forth in *Burns Jackson Miller Summit & Spitzer v Lindner* (59 NY2d 314, 325 [1983]).[6] That prong, the "most important[ ]" of the three factors (*Sheehy,* 73 NY2d at 634, quoting *Burns Jackson Miller Summit & Spitzer v Lindner,* 59 NY2d at 325), focuses on "whether creation of such a right would be consistent with the legislative scheme" (*Sheehy,* 73 NY2d at 633 [citations omitted]). Because of the Legislature's plenary authority over its choice of goals and the methods to effectuate them, "a private right of action should not be judicially sanctioned if it is incompatible with the enforcement mecha-

---

**5.** It is at least conceivable, after all, that there could be ample precedent supporting the authority of the Attorney General under the common law to bring some cause of action that the N-PCL does not authorize the Attorney General to bring.

**6.** The other "essential factors to be considered are: (1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; [and] (2) whether recognition of a private right of action would promote the legislative purpose" (*Sheehy,* 73 NY2d at 633).

nism chosen by the Legislature or with some other aspect of the over-all statutory scheme" (*Sheehy*, 73 NY2d at 634-635 [citation omitted]). Pointing to the causes of action expressly provided both in the Dram Shop Act (General Obligations Law § 11-101) and other provisions of the General Obligations Law, the Court held that the contended-for private right of action was not consistent with the "scheme" the Legislature "deliberately adopted . . . for affording civil damages to those injured by the negligent or unlawful dispensation of alcohol" (*Sheehy*, 73 NY2d at 635). As the Court wrote, "[w]here the Legislature has not been completely silent but has instead made express provision for civil remedy, albeit a narrower remedy than the plaintiff might wish, the courts should ordinarily not attempt to fashion a different remedy, with broader coverage . . . ." (*Sheehy*, 73 NY2d at 636.)

Similarly, in *Mark G. v Sabol*, the Court rejected the plaintiff's claim that a private right of action for money damages under title 4 of article 6 of the Social Services Law should be recognized. As in *Sheehy*, the third and "most critical" (*Mark G. v Sabol*, 93 NY2d at 720) factor in the three-part test— "whether creation of such a [private] right [of action] would be consistent with the legislative scheme" (*id.* at 719, quoting *Sheehy*, 73 NY2d at 633 [internal quotation marks omitted])— again was decisive. In explaining its conclusion that recognizing such a cause of action "would not be consistent with the legislative scheme" (*id.* at 720), the Court wrote:

> "The Legislature specifically considered and expressly provided for enforcement mechanisms. As Senator Pisani's sponsoring memorandum makes clear, the provisions of title 4 were enacted as the 'comprehensive' means by which the statute accomplishes its objectives. Given this background, it would be inappropriate for us to find another enforcement mechanism beyond the statute's already 'comprehensive' scheme" (*id.*).

Or, as the Court also stated, "[c]onsidering that the statute gives no hint of any private enforcement remedy for money damages, we will not impute one to the lawmakers" (*id.* at 721).

Indisputably, and as is evident from both the text of the N-PCL and the three Explanatory Memoranda prepared by the Joint Legislative Committee to Study Revision of Corporation Laws which accompanied the N-PCL when it was enacted by

chapter 1066 of the Laws of 1969,[7] the N-PCL is a comprehensive enactment. As is reflected in various sections of the N-PCL, the "Legislature specifically considered and expressly provided for enforcement mechanisms" (*Mark G. v Sabol,* 93 NY2d at 720). Primarily in N-PCL 112 and 720 (b), the Legislature expressly authorized the Attorney General to bring specific causes of action. The comprehensive nature of the Legislature's enforcement scheme is evinced as well by the provision in N-PCL 720 (b), conferring authority on the Attorney General, the corporation and specified others to bring the causes of action set forth in N-PCL 719 (a) and 720 (a), causes of action which enforce various strictures of the N-PCL.

Moreover, in addition to the remedies already discussed, the Legislature provided for other forms of judicial redress for unlawful payments to directors and officers. Directors against whom a claim is successfully asserted under N-PCL 719 (d)—for example, a director who votes for or concurs in a distribution of the corporation's cash or property to a member, director or officer (other than one authorized by N-PCL 515) and, "in the circumstances, [fails to] discharge[ ] his duty to the corporation under [N-PCL] 717" (N-PCL 719 [e])—are granted what amounts to a right of contribution from the recipient (N-PCL 719 [d] [1]). However, consistent with the broad provision of N-PCL 719 (e) that no director or officer shall be liable under section 719 "if, in the circumstances, he discharged his duty to the corporation under section 717," that right of contribution is qualified. That is, the director can recover from the recipient director or officer only if the distribution was received "with knowledge of facts indicating that it was not authorized by [the N-PCL]" (N-PCL 719 [d] [1]).[8]

A due respect for the competence of the Legislature requires us to conclude that the many remedial choices it made were considered choices (*see Middlesex County Sewerage Authority v National Sea Clammers Assn.,* 453 US 1, 15 [1981] ["In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the

---

**7.** The memoranda are reprinted in McKinney's Consolidated Laws of NY (Book 37, Not-For-Profit Corporation Law, at XVII-XLII).

**8.** As Grasso also points out, the Attorney General is empowered to seek structural change on account of such an unlawful payment. Thus, the Attorney General is authorized to maintain an action to "dissolve a corporation that has acted beyond its capacity or power" (N-PCL 112 [a] [1]) and to "procure a judgment removing a director . . . for cause under section 706" (N-PCL 112 [a] [4]).

remedies it considered appropriate"]; *Farrington v Pinckney,* 1 NY2d 74, 88 [1956] ["the choice of measures is for the legislature, who are presumed to have investigated the subject, and to have acted with reason, not from caprice" (internal quotation marks omitted)]). In other words, "that the [N-PCL] gives no hint" (*Mark G. v Sabol,* 93 NY2d at 721) of authority inhering in the Attorney General to bring causes of action other than those it authorizes the Attorney General to bring, provides a reason—even if it is not necessarily a decisive one—to conclude that the Attorney General lacks such authority.

What is of decisive importance is that the four nonstatutory causes of action are plainly inconsistent with core provisions of the legislative scheme governing the duties and liability of officers and directors. That inconsistency is most palpable with respect to the first and fourth causes of action. Both seek judgments requiring Grasso to repay allegedly unlawful compensation he received; each would require the Attorney General to prove only that the payments made to Grasso were neither compensation payments "in a reasonable amount" (as N-PCL 515 [b] requires) nor compensation payments "commensurate with services performed" (as N-PCL 202 [a] [12] requires). By contrast, in authorizing the Attorney General to bring the second cause of action under N-PCL 720 (a) (2) to "set aside an unlawful conveyance, assignment or transfer of corporate assets," the Legislature expressly required the Attorney General to prove more. That is, the Attorney General must prove that "the transferee knew of its unlawfulness" (N-PCL 720 [a] [2]). And in authorizing the Attorney General to bring the third cause of action under N-PCL 720 (a) (1) (A) and (B) for, as the Attorney General puts it, Grasso's alleged conduct in "influencing and accepting awards of excessive compensation," the Legislature expressly specified that a director "shall not be liable . . . if, in the circumstances, he discharged his duty to the corporation under section 717" (N-PCL 719 [e]). Nonetheless, the first and fourth causes of action would impose liability on Grasso without regard to either of these fault-based requirements of the legislative scheme. Under the Attorney General's view of his authority, he is free to avoid the burden of proving either requirement—each of which is likely to be the most difficult element to prove of the statutory causes of action—but nonetheless obtain the full relief he is authorized to obtain under the statutory causes of action. All he need do under

his theory of his powers is simply elect to bring the first or fourth cause of action.[9]

In short, the N-PCL reflects an apparent conclusion by the Legislature about what sound public policy requires in any action brought against directors or officers under N-PCL 720 (a) (2), 720 (a) (1) (A) or 720 (a) (1) (B)—i.e., that such a fault-based requirement should be essential to their liability. Surely the nature and extent of the liability of directors and officers for, in particular, receiving excessive compensation and, more generally, for receiving a conveyance, assignment or transfer of corporate assets, are matters of considerable public importance. They certainly are factors of vital importance to any sensible person deciding whether to accept the responsibilities of being a director or officer. In seeking to impose liability on Grasso without regard to either of the fault-based requirements of the legislative scheme, the complaint brings into sharp focus the fundamental problem with the Attorney General's position: its inconsistency with the principle of separation of powers.

As an elected representative of the executive branch, the Attorney General unquestionably is entitled to deference from the judiciary in the exercise of his powers. What the Court of Appeals has stated of the Governor is true as well of the Attorney General: "[t]he executive has the power to enforce legislation and is accorded great flexibility in determining the methods of enforcement" (*Rapp v Carey*, 44 NY2d 157, 163 [1978] [citation omitted]). As the Court immediately went on to stress, however: "But he may not, as was recently said of the Mayor of the City of New York, 'go beyond stated legislative policy and prescribe a remedial device not embraced by the policy' (*Matter of Broidrick v Lindsay*, 39 NY2d 641, 645-646)" (*Rapp v Carey*, 44 NY2d at 163). The reason he may not, of course, is the "constitutional

---

**9.** In this regard, the Attorney General's position calls to mind the venerable prohibition on public officials doing indirectly what they are forbidden from doing directly (*see e.g. Matter of Diamond Asphalt Corp. v Sander*, 92 NY2d 244, 259 [1998]; *People ex rel. Burby v Howland*, 155 NY 270, 280-281 [1898]). In this case, however, the Attorney General's position is that he can avoid indirectly what he cannot avoid directly. In the context of an action brought by a private litigant, this Court recently rejected a similar attempt to create a hybrid (that is, both common-law and statutory) claim. In *Han v Hertz Corp.* (12 AD3d 195, 196 [2004]), the "plaintiff [did] not allege any actionable wrongs independent of the requirements" of a statute that did not permit a private right of action. As we held, "[s]ince no private right of action exists, the claims for money had and received and unjust enrichment were properly dismissed as an effort to circumvent the legislative preclusion of private lawsuits for violation of the statute" (*id.*).

principle of separation of powers, . . . [which] requires that the Legislature make the critical policy decisions, while the executive branch's responsibility is to implement those policies" (*Bourquin v Cuomo,* 85 NY2d 781, 784 [1995] [citations omitted]; *see also Sheehy,* 73 NY2d at 636 [rejecting implied right of action as "inconsistent with the evident legislative purpose underlying the (statutory) scheme" and refusing to "overrid(e) this legislative policy judgment"]). Notably, in the fourth cause of action, the Attorney General asserts that Grasso's retention of the allegedly unlawful compensation "is against equity, good conscience and public policy." Only the Legislature, however, can eliminate the fault-based requirements of the N-PCL in the name of sound public policy.

The fifth and sixth causes of action similarly "go beyond stated legislative policy and prescribe a remedial device not embraced by the policy" (*Matter of Broidrick v Lindsay,* 39 NY2d at 645-646). The particulars of each cause of action are discussed above and need not be repeated. The key point is that these causes of action also circumvent the substantive standards for the liability of directors and officers established by the Legislature in N-PCL 717, 719 (e) and 720 (a) (2). Because "the Legislature has not been completely silent but has instead made express provision for civil remedy," neither the judiciary nor the executive branch should "attempt to fashion a different remedy, with broader [liability]" (*Sheehy,* 73 NY2d at 636). The fifth cause of action suffers from the additional infirmity of being a watered-down version of the cause of action the Legislature expressly recognized as one the corporation but not the Attorney General was authorized to bring.

The inconsistency between the nonstatutory causes of action and the policy choices made by the Legislature in the N-PCL is sufficient to dispose of the reliance by the Attorney General and the dissent on the parens patriae doctrine. Under this doctrine, a state has standing to bring a cause of action that otherwise properly can be brought only by private parties, if the state can "articulate an interest apart from the interests of [the] particular private parties," "express a quasi-sovereign interest" and allege "injury to a sufficiently substantial segment of its population" (*Alfred L. Snapp & Son, Inc. v Puerto Rico ex rel. Barez,* 458 US 592, 607 [1982]; *see also People v Mid Hudson Med. Group, P.C.,* 877 F Supp 143, 146 [1995] [citing numerous cases upholding parens patriae authority of the state to assert various causes of action on behalf of others]). But the authority to as-

sert a cause of action hardly entails the authority to amend the elements of a cause of action. Thus, nothing in *Alfred L. Snapp & Son* even remotely suggests that because Puerto Rico had standing to assert causes of action under federal law against the petitioners for discriminating against its citizens in favor of foreign laborers, Puerto Rico also had the authority to modify the substantive elements of those federal causes of action. Nor does any other case cited by the dissent support the proposition that by invoking the parens patriae doctrine, the executive branch officials who bring suit to *enforce* the law also enjoy the quintessentially legislative authority to *alter* the law. In short, the authority to bring suit in what the Attorney General perceives to be the interest of the state cannot trump contrary determinations about the public interest made by the Legislature (*Bourquin v Cuomo*, 85 NY2d at 784).

The dissent does not dispute that the four nonstatutory causes of action are inconsistent with core provisions of the N-PCL or that the Attorney General is asserting a parens patriae-based authority to amend the N-PCL. Nor does the dissent appear troubled by the tension between the Attorney General's position and fundamental principles of separation of powers. At least tacitly, the dissent admits all this, but offers a defense of necessity. That is, the dissent maintains, for example, that "the Attorney General had a responsibility to bring this action to ensure that the Exchange was being operated in a fair and honest manner." Similarly, the dissent urges that "[a]llowing the Attorney General standing to prosecute the common-law claims . . . is also vital to protect public confidence in the NYSE and the investing community."

From these and other assertions of the dissent, one might think that Grasso remained in a position of authority at the NYSE or that the Attorney General was seeking in this action to effectuate structural reforms at the NYSE that would eliminate or reduce the risk of a recurrence of the alleged misconduct. In fact, of course, Grasso submitted his resignation months before this action was commenced and no such reforms are sought. Assuming as we must for purposes of this appeal the truth of the allegations against Grasso, we do not deprecate their significance by noting that the purpose of the complaint is to return to the NYSE the very substantial sums of money that Grasso allegedly received through unlawful means. How the return of that money vindicates the compelling public purposes the dissent invokes—"ensur[ing] that the Exchange [is] being

operated in a fair and honest manner" and "protect[ing] public confidence in the NYSE and the investing community"—is a matter that the dissent fails to explain. But assuming that the return of the money is a matter of such transcendent and public importance, the dissent fails to address let alone explain even more fundamental matters: why, to the end of getting the money back, the NYSE, which has express authority under N-PCL 719 and 720 to sue officers and directors for a broad range of improper conduct, needs the Attorney General's help; and why, to the same end, the N-PCL must be amended by the Attorney General.

That is not to suggest, however, that it would be of any legal moment if the dissent or the Attorney General were able to provide satisfactory answers to these questions. It would not matter at all, for example, if permitting the Attorney General to prosecute the nonstatutory causes of action were "vital to protect public confidence in the NYSE and the investing community."[10] It would not matter because although such a grave and urgent state of affairs would warrant an appeal by the Attorney General to the Legislature to change the law, it would not be a warrant for the Attorney General or any member of the executive branch to displace the policy choices made by the Legislature. Under the dissent's view of the parens patriae doctrine and the Attorney General's inherent powers, the only limitation on the Attorney General's authority to rewrite the N-PCL on account of this alleged state of affairs is the Attorney General's view of what sound public policy requires. That transferral of policy-making authority is precisely what is wrong with the position of the Attorney General and the dissent. As for Grasso's other contentions, we need not and do not address them.

---

**10.** If the stakes were and are as enormous as the dissent posits, however, why the members of the NYSE could not be trusted to take action in the face of such a threat to their livelihood is surely another matter that requires explanation. In this regard, the dissent wrongly asserts that the "members of the NYSE had no incentive to challenge the Board of Directors on the issue of the amount of executive compensation packages." As the dissent inconsistently recognizes, "[c]onsistent with the practice of all not-for-profit corporations, profits were to be reinvested for the welfare of the Exchange." Obviously, the welfare of the members is enhanced as the welfare of the NYSE is enhanced through the reinvestment of profits. Just as obviously, the welfare of the members is adversely affected to the extent profits are instead diverted to compensation packages that are excessive (either because the compensation is not commensurate with services performed, is unnecessary to attract and retain the executives or otherwise does not advance the interests of the Exchange).

Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered March 15, 2006, which denied defendant Richard A. Grasso's motion, pursuant to CPLR 3211 (a) (7), to dismiss the first, fourth, fifth and sixth causes of action against him, should be reversed, on the law, without costs, and the motion granted.

MAZZARELLI, J.P. (dissenting). The New York Stock Exchange (NYSE or the Exchange), which traces its origins back to 1792, is the world's largest equities market. On an average trading day in 2006, 2.3 billion shares, valued at $86.6 billion, were traded on the Exchange.[1]

That the NYSE plays a vital role in our state and federal economy is plain.

> "The health of the U.S. economy is typically measured by the stock market. When stock prices rise, and there is a 'bull market,' U.S. business is assumed to be doing well. When stock prices fall and there is a 'bear market,' a downturn in business and the economy is assumed" (9 West's Encyclopedia of American Law 353 [2d ed 2005]).

Over time, investment activity on the NYSE has seen a marked increase. Between 1995 and 1998, the number of individuals trading stock on the NYSE increased by 15 million and between 1989 and 1998 by 32 million (NYSE, Shareownership 2000, Based on the 1998 Survey of Consumer Finances, at 10). By 1998, there were approximately 84 million investors trading on the NYSE (*id.*). Likewise, the number of companies whose shares are traded on the Exchange has grown into the thousands.

The Securities and Exchange Commission (SEC) has regulatory oversight powers over the NYSE and monitors all Exchange activity to prevent the manipulation of stock prices or any other illegality. The NYSE itself, and its officers, in turn, have regulatory authority over the member organizations whose securities are listed on the Exchange. This includes the authority, at the direction of the SEC, to discipline member firms or enact rules for governance of the Exchange.

At all times relevant to this litigation, the NYSE was incorporated under article 14 of the Not-For-Profit Corporation Law (N-PCL) as a Board of Trade and self-regulating private nonprofit corporation. The NYSE has 1,366 shareholders, who

---

**1.** (*See* <http://www.nyse.com>.)

are called "members,"[2] and hold "seats" on the Exchange. Some members use their seats; others lease them to firms who wish direct access to the trading floor. Seat holders pay fees to the NYSE based upon their trades. However during the period relevant to this appeal, the NYSE, like all not-for-profit corporations, did not distribute profits or net earnings to anyone. Consistent with the practice of all not-for-profit corporations, profits were to be reinvested for the welfare of the Exchange.

The N-PCL was drafted to regulate a number of different types of corporations, classified according to their purposes and goals.[3] Boards of Trade such as the NYSE are classified as Type A not-for-profit corporations (N-PCL 1410 [b]). The objective of a Type A not-for-profit is to "foster[ ] trade and commerce" (N-PCL 1410 [a]).[4]

Defendant Richard A. Grasso was the NYSE's Chairman and Chief Executive Officer (CEO) from 1995 until September 17, 2003. During that period, Grasso executed three employment agreements, one in 1995, one in 1999 and one in 2003. The agreements outlined, in general terms, the scope of Grasso's duties and the source of his compensation. In addition, during Grasso's tenure the NYSE's Board of Directors had a Compensation Committee whose duty it was to set Grasso's annual compensation. As relevant here, the Compensation Committee met in February of each year, at which time it made decisions for the prior calendar year.

On August 27, 2003 the Board of Directors of the NYSE and Grasso executed his third and final employment agreement. The 1995, 1999 and 2003 agreements provided for a base annual salary of $1.4 million. However, before Grasso resigned, he received a lump sum payment of $139.5 million. He was also promised an additional $48 million to be paid pursuant to various benefit programs at a future date. Those benefit programs

---

**2.** A "member" of the NYSE, as presently defined, is an individual approved by the Exchange and designated by a member organization to effect transactions on the floor of the Exchange, on any facility thereof, on its behalf (http://www.nyse.com).

**3.** N-PCL 201 (b) provides for the formation of four types of not-for-profit corporations: Type A, Type B, Type C and Type D.

**4.** When the acts at issue occurred, the NYSE was a Type A not-for-profit, which is one which may be formed for any nonbusiness purpose including, but not limited to, any one of the following nonpecuniary purposes: civic, patriotic, political, social, fraternal, athletic, agricultural, horticultural, animal husbandry and for a professional, commercial, industrial, trade or service association.

included: (1) an Incentive Compensation Plan (ICP); (2) a Long Term Incentive Plan (LTIP); (3) a Capital Accumulation Plan (CAP); (4) a Supplemental Executive Retirement Plan (SERP); and (5) a Supplemental Executive Savings Plan (SESP). Also on August 27, 2003, the NYSE issued a press release revealing that $139.5 million would be immediately payable to Grasso. The press release did not disclose the $48 million future payment.

In September of 2003, the Chairman of the SEC contacted the NYSE and requested information concerning Grasso's compensation. In response to increasing internal and external pressure, Grasso agreed to forgo the future benefit payments he had been promised. Several weeks later, he resigned. In January 2004, the Interim Chairman and CEO of the NYSE wrote a letter to the Attorney General stating that serious damage had been inflicted upon the NYSE. The interim CEO requested that either the Attorney General or the Chairman of the SEC pursue the matter of Grasso's "unreasonable compensation" and other "failures of governance and fiduciary responsibility."

The Attorney General brought this action on behalf of the People of the State of New York. The complaint alleges that the NYSE paid Grasso an unlawful amount of compensation and it seeks that such sums be returned to the Exchange. Various counterclaims and a cross claim have been interposed, and at least one third-party action has been commenced.

The Attorney General alleges that Grasso misused his authority to select only people he could control to serve on the Compensation Committee in order to obtain exorbitant sums for himself. In fact, the complaint alleges that Grasso's total compensation and benefits from 2000 to 2002 were equal to 99% of the NYSE's net income during those same years. The Attorney General accuses Grasso of exerting his influence over the NYSE's Board of Directors to maximize his compensation, approving the actions of those inclined to increase his benefits and punishing those who sought to curb them. He also alleges that Grasso preformed a variety of insidious acts which directly affected pending deals by companies listed on the Exchange, in an effort to maximize votes in favor of his salary. For example, the Attorney General alleges that Grasso quietly assured a member of the Compensation Committee that a deal involving his company would be approved by the NYSE Market Performance Committee, allegedly in exchange for his vote in favor of Grasso's compensation. The complaint also asserts that there was an industry perception that companies whose executives

served on the Board of Directors of the NYSE would receive preferential treatment by the Exchange.

While not relevant to the disposition of this appeal, it bears noting that in March of 2006, nearly two years after the initiation of this action, the NYSE reorganized into two distinct entities: (1) a New York not-for-profit regulatory entity and, (2) a Delaware for-profit public corporation. This reorganization is currently the subject of a legal challenge (*Higgins v New York Stock Exch., Inc.*, 10 Misc 3d 257 [2005]).

## This Appeal

The complaint in this action contains six causes of action against defendant Grasso. This is an appeal from the motion court's denial of defendant Grasso's CPLR 3211 (a) (7) motion to dismiss four of those causes of action: the first, fourth, fifth and sixth. The first cause of action seeks to impose a "constructive trust," or restitution to the NYSE of Grasso's compensation. The fourth claims that Grasso is required to return money received by him in excess of reasonable compensation under a theory of money had and received. The fifth claims that defendants violated N-PCL 715 (f), which requires that the salaries of officers be fixed by the affirmative vote of a majority of the entire board. The claim in this cause of action is that a majority of the board did not effectively vote to approve various of Grasso's compensation awards, because it was presented with allegedly inaccurate and incomplete information. The sixth is predicated on N-PCL 716. It alleges that defendants violated the statutory prohibition against the making of loans by a not-for-profit corporation to its directors or officers.

## Standing

Defendant Grasso challenges the Attorney General's ability to bring the causes of action at issue. He argues that the Attorney General is without authority because the sections of the N-PCL under which he is proceeding do not specifically empower the Attorney General to bring a lawsuit for their enforcement. He reasons that because a number of sections of the N-PCL do explicitly authorize claims by the Attorney General, this implicitly precludes the Attorney General from enforcing other sections of the statute. It is Grasso's contention, adopted by the majority, that "that which was not explicitly included was implicitly excluded."

I disagree. This is a case with far-reaching state and national economic implications. The complaint makes allegations which, if proved, call into question the integrity of the New York Stock

Exchange during Grasso's tenure. It is my view that the Attorney General has standing, under his broad parens patriae power, to protect the State, by protecting the NYSE, from a loss of public confidence because of allegations of serious mismanagement. Given the NYSE's role in the state and national economy, problems with its corporate governance are the proper subject of the Attorney General's concern. Dating back to the colonial era, the "Attorney General of New York served . . . as this Colony's chief law officer" (*People v Gilmour*, 98 NY2d 126, 129-130 [2002], citing 2 Lincoln, The Constitutional History of New York, at 526-527 [1906]). When the representatives met to draft the first New York Constitution, they recognized a need for a chief law enforcement officer (Karl Swanson, The Background and Development of the Office of Attorney General in New York State, at 121 [1958]). Although there was no express provision for an Attorney General in the original 1777 Constitution, "the institution had roots of almost a century in the jurisdiction" and the office was already functioning in the State's government at this time (*id*. at 121). Eventually, New York State Constitution, art V, §§ 1 and 4 were amended to expressly provide for an Attorney General to serve as the head of the State's Department of Law. Although many statutes delineate a specific role in the enforcement of certain provisions by the Attorney General, his powers and duties do not derive from, and are not limited by those statutes. Accordingly, the fact that the challenged claims are not explicitly authorized by the N-PCL does not expressly preclude them.

The opinion of the United States Supreme Court in *Alfred L. Snapp & Son, Inc. v Puerto Rico ex rel. Barez* (458 US 592 [1982]) informs my analysis. In *Snapp*, the Supreme Court upheld the right of an individual state to bring an action in parens patriae to assert its sovereign interest of protecting its citizens from discrimination. The petitioners in *Snapp*, individual United States apple growers, questioned whether the Commonwealth of Puerto Rico had standing to bring an action in favor of the migrant workers denied jobs by them. The complaint alleged that the growers violated two statutes, resulting in discrimination against the residents of Puerto Rico. The Supreme Court upheld the Commonwealth's authority to bring the action, emphasizing that while parens patriae authority cannot be used simply to vindicate individual interests, it can be asserted to protect what are properly sovereign interests. In *Snapp* the sovereign interest at stake was the "health and well-

being—both physical and economic—of [the residents of Puerto Rico]" (*Snapp*, 458 US at 607).

Subsequent cases applying the *Snapp* rule have articulated three requirements for the assertion of parens patriae power:

> "(a) the [S]tate 'must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party'; (b) the State 'must express a quasi-sovereign interest'; and (c) the State must have 'alleged injury to a sufficiently substantial segment of its population' " (*People v Mid Hudson Med. Group, P.C.*, 877 F Supp 143, 146 [SD NY 1995] [citation omitted] [allowing Attorney General to bring common-law action to enforce the rights of hearing impaired patients where governing statutes did not provide standing for state attorneys general]).

Here, it is plain that the allegedly excessive compensation paid to Grasso is a matter of statewide and national concern. The integrity of the NYSE is not merely a matter of concern to members holding seats on the Exchange. The complaint implicitly seeks relief for the protection of the investing public at large, and for the state and national economy (*see State of New York v General Motors Corp.*, 547 F Supp 703, 705 [SD NY 1982] ["State's goal of securing an honest marketplace in which to transact business is a quasi-sovereign interest"]; *cf. People v Seneci*, 817 F2d 1015, 1017 [1987] [Attorney General did not have standing to sue for damages where there was no alleged injury to a quasi-sovereign interest]). As discussed, millions of individual and institutional investors rely on the integrity of the NYSE. While these investors do not have standing to challenge the claimed excessive compensation at issue in this case, their interests are the proper subject of the Attorney General's attention. To the extent that the complaint alleges that deals by companies whose executives voted favorably to Grasso would receive preferential treatment in their dealings, the Attorney General had a responsibility to bring this action to ensure that the Exchange was being operated in a fair and honest manner.

The importance of public oversight of not-for-profit corporations has been recognized before, in a case involving an alleged gross breach of fiduciary duty (*American Baptist Churches of Metro. N.Y. v Galloway*, 271 AD2d 92 [2000]). Although the claims at issue on appeal here do not involve the same type of willful misconduct claimed in *American Baptist*, the following

quotation from that case is nonetheless relevant to an understanding of the issue:

> "A not-for-profit corporation is not the same as a corporation that loses money. *It is simply a corporation that devotes whatever proceeds it receives from its operations to charitable causes rather than disbursing the funds as dividends to shareholders and compensation to executives.* Just as the goal of a for-profit corporation is to make money for its investors, the goal of a not-for-profit is to make money that can be spent on furthering its social welfare objectives. *Both types of companies have suffered an injury when a fiduciary's misconduct frustrates these goals*" (*id.* at 97-98 [emphasis supplied]).

*Consumers Union of U.S., Inc. v State of New York* (5 NY3d 327 [2005]) also supports the Attorney General's power to initiate these claims. In that case, the subscribers to a not-for-profit health plan challenged the insurer's conversion to a for-profit corporation, and certain acts of the board of directors under N-PCL 720. N-PCL 720 (b) listed the individuals who could sue under section 720, and the list did not include the plaintiffs. However, the Court of Appeals held that the plaintiffs had "standing to prosecute th[e] action solely for purposes of protecting [the company's] not-for-profit assets" (*Consumers Union, supra* at 354; *see also Alco Gravure, Inc. v Knapp Found.*, 64 NY2d 458 [1985] [standing conferred on beneficiaries of not-for-profit corporation to challenge action taken under N-PCL 804 although standing was not specifically conferred upon plaintiffs by statute]).

In support of dismissing the causes of action here, Grasso cites *Lefkowitz v Lebensfeld* (68 AD2d 488, 495 [1979], *affd* 51 NY2d 442 [1980]). In *Lefkowitz,* the issue before the court was whether the Attorney General had standing under the Estates, Powers and Trusts Law (EPTL) to sue the board of directors of a charity on behalf of a number of unrepresented beneficiaries. The *Lefkowitz* complaint alleged that the board breached its fiduciary duties, and the action sought to compel the declaration and payment of dividends. This Court held that the Attorney General did not have standing to bring the action. The Court of Appeals affirmed, holding that the Attorney General was precluded from bringing an action in a "quasi-shareholder-derivative" capacity, without first making a demand upon the board of the not-for-profit corporation and satisfying the other

prerequisites of a shareholder derivative suit. The Court of Appeals also noted that the EPTL did not explicitly provide for a right of action on behalf of the Attorney General. However, the Court of Appeals stated: "we do not decide whether and in what instances the Attorney-General possesses standing under the Not-For-Profit Corporation Law" (51 NY2d at 448).

The facts in this case are entirely dissimilar to *Lefkowitz*. The charities at issue in *Lefkowitz* chose not to sue to enforce their rights, and the court held that the Attorney General could not step in and do so for them without following certain procedural preconditions. Here, by contrast, the Attorney General is not attempting to sue on behalf of the NYSE seat holders to vindicate their rights. The action is brought by the Attorney General, through his authority as parens patriae, to protect the integrity of the NYSE and to promote a healthy economy for the citizens of this state (*cf. Lefkowitz, supra*; *Clearing House Assn., L.L.C. v Spitzer*, 394 F Supp 2d 620 [SD NY 2005] [commercial banks enjoined Attorney General from bringing an action to enforce residential mortgage lending practices on their behalf]).

Grasso also relies upon three other cases, *Uhr v East Greenbush Cent. School Dist.* (94 NY2d 32 [1999]), *Mark G. v Sabol* (93 NY2d 710 [1999]) and *Sheehy v Big Flats Community Day* (73 NY2d 629 [1989]), each of which is also distinguishable on its face. In each of these cases individual plaintiffs sought to recover money damages. The statutes in each of the cases did not explicitly provide for private rights of action. Thus, applying a formula articulated in *Sheehy*,[5] the Court of Appeals concluded that the plaintiffs in all three actions did not have standing to sue. Further, in *Uhr* and *Mark G.*, the courts found that defendants did not have a duty to the plaintiffs which would subject them to common-law tort liability.

Here, unlike *Uhr*, *Mark G.* and *Sheehy*, the Attorney General, the chief law enforcement official in the state, is suing on behalf of the People of the State of New York. The action is not for money damages. The Attorney General's office requests that Grasso's compensation, to the extent deemed improper, be returned to the Exchange (*cf. People v Seneci*, 817 F2d 1015 [1987] [Attorney General did not have the power to bring an ac-

---

5. The *Sheehy* three-part test asks: "(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme" (73 NY2d at 633).

tion seeking money damages for state's citizens, where there was no quasi-sovereign interest at stake]).

As discussed earlier, the Attorney General's powers preexist the N-PCL. He enjoys broad authority to enforce that and other statutes. The Attorney General's powers are not merely coextensive with those provisions in the statute which refer to his office (*see 64th Assoc., L.L.C. v Manhattan Eye, Ear & Throat Hosp.*, 2 NY3d 585, 590-591 n 7 [2004]). Further,

> "*not-for-profit [corporations], unlike their for-profit* counterparts, by definition and concept do not have shareholders to whom profits are distributed. Given the absence of shareholders, profits and other market devices to ensure the efficacy of contracts and regularity of operations, the statute contemplates significant public oversight of the finances and major transactions of such entities" (*id.* at 590 [emphasis supplied]).

The NYSE, during the period at issue, was a Type A not-for-profit corporation, formed for a lawful nonbusiness purpose, here as a Board of Trade created to foster "trade and commerce" (N-PCL 201 [b]; 1410 [a] [1]). Profits generated by the trades conducted by the NYSE seat holders at that time provided no benefit to the Exchange. Conversely, the seat holders' income did not increase if the assets of the NYSE increased. Thus, members of the NYSE had no incentive to challenge the Board of Directors on the issue of the amount of executive compensation packages.

Moreover, here, the Attorney General alleges that Grasso's compensation was the result of misuse of the corporation's regulatory authority with far-reaching financial implications. If the allegations as to Grasso's ability to effect specific transactions are substantiated, the integrity of the entire NYSE during Grasso's tenure is at issue. Allowing the Attorney General standing to prosecute the common-law claims in the complaint is not only in the interest of promoting the health of the state's economy, but it is also vital to protect public confidence in the NYSE and the investing community (*see Consumers Union*, 5 NY3d 327 [2005], *supra*).

Clearly, the N-PCL was not specifically drafted to regulate the NYSE, and the alleged egregious misuse of funds was an unanticipated event. It is not determinative that N-PCL 202 (a) (12), which requires that compensation of the officers of not-for-profit corporations must be "commensurate with services

performed," and N-PCL 515 (b), which mandates that officers' compensation be "reasonable," do not include language giving the Attorney General enforcement power. Accordingly, a flexible approach allowing the Attorney General standing to pursue the claims at issue is called for here and does not violate the required separation of legislative and judicial powers.

## CPLR 3211 (a) (7) Motion to Dismiss

It must be emphasized that this is an appeal of the denial of a CPLR 3211 (a) (7) motion to dismiss four causes of action for failure to state a claim. In reviewing the trial court's ruling on defendant's motion, we, like the motion court, must assume the truth of all of the factual allegations in the complaint, resolve every reasonable inference in favor of the Attorney General (*Leon v Martinez*, 84 NY2d 83 [1994]), and "determine . . . whether the facts alleged fit within any cognizable legal theory" (*Morone v Morone*, 50 NY2d 481, 484 [1980]). The issue is not whether the Attorney General will ultimately prevail on the claims at issue, but only whether he should be allowed to offer evidence to support them (*see People v Mid Hudson Med. Group, P.C.*, 877 F Supp at 146).

## First Cause of Action: Based upon violations of N-PCL 202 (a) (12) and 515 (b), seeking imposition of a constructive trust and restitution

In the first cause of action, the Attorney General asserts that as an officer and director of the NYSE, Grasso violated N-PCL 202 (a) (12) and 515 (b) because his compensation was neither "reasonable" nor "commensurate with services performed." The extant record reveals that as CEO of the NYSE defendant Grasso was charged with the management of a company with a net income in 2002 of $28 million. His job included setting the rules about the trading of stocks under NYSE jurisdiction and managing the workings of this not-for-profit corporation. His 2003 compensation was well in excess of $139.5 million, more than four times the net income of the organization he ran. These facts alone are sufficient to state a claim under N-PCL 202 (a) (12) and 515 (b).

The Attorney General characterizes these acts as ultra vires, beyond the power of the corporation, in the common-law sense. He thus requests, in this cause of action, that the court place any of Grasso's compensation deemed unreasonable or not commensurate with the services he performed in a constructive trust (*see Simonds v Simonds*, 45 NY2d 233 [1978]). " '[A] constructive trust is the formula through which the conscience

of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee' " (*id.* at 241, quoting *Beatty v Guggenheim Exploration Co.*, 225 NY 380, 386 [1919]). Defendant Grasso contends that because N-PCL 203 provides a mechanism for redressing alleged ultra vires acts, the Attorney General is foreclosed from claiming that Grasso's compensation was ultra vires as part of the first cause of action. However, section 203 (a) is not at issue here.[6] The Attorney General's contention with respect to Grasso's compensation is that it violated N-PCL 202 (a) (12) and 515 (b). I would find that the pleadings allege sufficient facts to support the first cause of action under the common law, as informed by N-PCL 202 (a) (12) and 515 (b).

Fourth Cause of Action: Under N-PCL 202 (a) (12) and 515 (b), for payment had and received

The fourth cause of action is for payment had and received. The Attorney General asserts that inasmuch as the annual compensation received by Grasso was unreasonable and not commensurate with the services he performed, it would be contrary to the laws and public policy of New York to permit Grasso to retain such unlawful gains. Such a cause of action is premised

> "upon the equitable principle that a person shall not be allowed to enrich him[ or herself] unjustly at the expense of another . . . It is an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money . . . under such circumstances that in equity and good conscience he [or she] ought not to retain it" (*Miller v Schloss*, 218 NY 400, 407 [1916]).

Defendant Grasso argues, in part, that the claim for money had and received is precluded because his compensation was the product of several written agreements. However, the complaint alleges that very little of Grasso's compensation was set forth in any contract, and instead was the result of, among other things, computations derived based upon eligibility formulations. Further, the Attorney General alleges that the Compensation Committee was not fully or accurately informed. He alleges that it was furnished with misleading information. Applying the stan-

---

**6.** The Attorney General's common-law claim does not concede, under section 203 (a), that Grasso's compensation was "otherwise lawful."

dard of review for a CPLR 3211 (a) (7) motion to dismiss, a viable claim for money had and received is set forth in the Attorney General's allegation that the NYSE paid Grasso compensation that violated both common-law and basic contractual principles (*see Citipostal, Inc. v Unistar Leasing*, 283 AD2d 916, 919 [2001]; *Manufacturers Hanover Trust Co. v Chemical Bank*, 160 AD2d 113, 117-118 [1990], *lv denied* 77 NY2d 803 [1991]).

Fifth Cause of Action: Under N-PCL 715 (f)

The fifth cause of action invokes N-PCL 715 (f), which provides: "The fixing of salaries of officers, if not done in or pursuant to the by-laws, shall require the affirmative vote of a majority of the entire board unless a higher proportion is set by the certificate of incorporation or by-laws." The Attorney General asserts that this section was violated because a majority of the board did not properly vote to approve the future payments of CAP and SERP benefits to Grasso. The Attorney General alleges that the vote was not effective because the Board of Directors was presented with inaccurate and incomplete information regarding the extent of future benefits to be paid Grasso. He thus seeks restitution of all such sums which were not obtained with proper board approval.

Grasso answers that section 715 is only applicable to salaries and not to his pension benefits and deferred bonuses. However, the record is plain that the bulk of Grasso's compensation was in the form of bonuses and pensions. The requirements of section 715 may not be circumvented merely by designating most of an officer's compensation as bonuses and pensions, rather than salary. Again, we must view the allegations in the light most favorable to the Attorney General to determine whether a cause of action has been pleaded. Accordingly, I would hold that the fifth cause of action should be sustained (*see Mid Hudson Med. Group*, 877 F Supp at 146).

Sixth Cause of Action: Allegation that Grasso obtained illegal loans pursuant to N-PCL 716

The sixth cause of action is predicated on N-PCL 716, which states:

> "No loans, other than through the purchase of bonds, debentures, or similar obligations of the type customarily sold in public offerings, or through ordinary deposit of funds in a bank, shall be made by a [not-for-profit] corporation to its directors or

officers, or to any other corporation, firm, association or other entity in which one or more of its directors or officers are directors or officers or hold a substantial financial interest, except a loan of one type B corporation to another type B corporation. A loan made in violation of this section shall be a violation of the duty to the corporation of the directors or officers authorizing it or participating in it, but the obligation of the borrower with respect to the loan shall not be affected thereby."

The Attorney General alleges that Grasso, while serving as an officer and director, received two substantial loans from the NYSE to which he was not entitled. Grasso urges that N-PCL 716 is not applicable to the NYSE since such Boards of Trade are specifically exempt from that section and are permitted to make loans to their officers and directors pursuant to N-PCL 1410 (c) (2). However, that section provides that loans may only be made where the "board of directors finds that the making of such loan will be *in furtherance of its corporate purposes and for a lawful public or quasi-public objective*" (emphasis supplied). Viewing the allegations in the complaint in the light most favorable to the Attorney General, it cannot be said that, as a matter of law and prior to any disclosure, the purported loans extended to Grasso were in furtherance of the NYSE's corporate purposes and for a lawful public or quasi-public objective. Thus, I would conclude that the Attorney General has a cognizable claim under N-PCL 716.

Accordingly, I would affirm the order appealed denying defendant Grasso's motion, pursuant to CPLR 3211 (a) (7), to dismiss the first, fourth, fifth and sixth causes of action against him.

BUCKLEY and MALONE, JJ., concur with McGUIRE, J.; MAZZARELLI, J.P., and SAXE, J., dissent in a separate opinion by MAZZARELLI, J.P.